**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION**

| | |
|---|---|
| ALTRUS CAPITAL – ECO, LP; ALTRUS CAPITAL – GREEN LIGHTNING, LP; JOSEPH E. LEWIS III, directly and derivatively on behalf of GREEN LIGHTNING SOLUTIONS, LLC,<br><br>Plaintiffs,<br><br>v.<br><br>FIREWATER AG, LLC; AWESOME NITROGEN PVT. LTD; FIREWATER UK; TRAVIS POTTER; BLESSINGS ABUNDANTLY LLC; RYELEE POTTER; BRADLEY LILLEY; MATT VANDERHYDE; ERIK VADERS; NANA OBENG-MAYARESA; and BEN SMITH,<br><br>Defendants,<br><br>GREEN LIGHTNING SOLUTIONS, LLC,<br><br>Nominal Defendant. | **Civil Action No. _____** |

**VERIFIED COMPLAINT**

Plaintiffs Altrus Capital - Eco, LP and Altrus Capital - Green Lightning, LP (collectively, "Altrus"), Joseph E. Lewis III ("Lewis"), and Green Lightning Solutions, LLC ("Green Lightning") directly and derivatively, bring this Complaint against Defendants Firewater AG, LLC ("Firewater"), Awesome Nitrogen Pvt. Ltd. ("Awesome"), Firewater UK, Travis Potter ("Potter"), Blessings Abundantly LLC ("Blessings"), Ryelee Potter ("Ryelee"), Bradley Lilley ("Lilley"), Matt VanderHyde ("VanderHyde"), Hendrik "Erik" Vaders ("Vaders"), Nana Obeng-Mayaresa ("Obeng-Mayaresa") and Ben Smith ("Smith") (collectively, the "Defendants") and Nominal Defendant Green Lightning and respectfully allege the following:

## I.    **INTRODUCTION**

1.    This case arises from a coordinated scheme by Potter, while serving as a Manager, Member, and Chief Executive Officer of Green Lightning, to misappropriate Green Lightning's patented plasma fertilizer technology, confidential business information, workforce, and goodwill to launch a competing venture, Firewater. Potter's conduct breaches his fiduciary duties, violates federal and state trade secret law, infringes Green Lightning's intellectual property, constitutes false advertising and unfair competition, and violates numerous other statutory and common laws as alleged below.

2.    Green Lightning was formed in April 2024 to develop and commercialize the on-farm plasma nitrogen technology invented by Lewis. That technology powers Green Lightning's "Nitrogen Machine," which uses plasma to convert atmospheric nitrogen and water into a plant-available, nitrate-rich solution, reducing waste, improving soil health, and lowering the carbon footprint of agricultural nitrogen. Building on years of research and development by Lewis, Green Lightning protected its innovations through, among other rights, U.S. Patent No. 12,338,803 (the "'803 Patent"), titled "Apparatus for a Modular Plasma Reactor and Method of Use."

3.    Under Green Lightning's Operating Agreement, management authority rests jointly with Lewis and Potter; neither manager may act independently of the other. Under Section 3.02 of the Operating Agreement, "[s]hould more than one Manager be appointed, the powers of the Manager shall be exercised jointly upon agreement of all Manager(s), and the Manager(s) shall not act independently of each other." Operating Agreement § 3.02 (Ex. 1). Section 3.03 further prohibits, without the prior written approval of Members holding a majority interest, any Manager from, among other things: "(a) [e]ngag[ing] in any activity, for or on behalf of the Company, which

is either unlawful or in specific contradiction with the terms of this Agreement; … (e) [l]icens[ing] any intellectual property of the Company to any Person; [and] … (g) [m]ak[ing] any payment(s) or capital expenditures … which equals or exceeds $5,000.00, in the aggregate, during any single calendar week." Operating Agreement § 3.03 (Ex. 1). Green Lightning's 2025 Annual Reports filed with the Kentucky Secretary of State identify Potter as Manager and registered agent, confirming his fiduciary status at all relevant times. *See* Annual Report, filed Mar. 8, 2025 (Ex. 2).

4.     Despite these limitations, as well as fiduciary duties of loyalty and care, Potter secretly incorporated Firewater in July 2025, coordinated registration of Firewater's domain using Ryelee's (Potter's daughter) entity, and began positioning Firewater to compete directly with Green Lightning using Green Lightning's technology, personnel, and relationships.

5.     Firewater now markets the "7-Thunders" system, a multi-reactor plasma machine that, upon information and belief, embodies each element of at least claim 1 of the '803 Patent: a modular plasma reactor capable of generating a concentrated nitrogen solution for plant growth, a housing surrounding the reactor, an ignition unit, one or more injectors, at least one reservoir, and a controller. Firewater's own statements confirm that it "takes water and electricity and converts nitrogen and oxygen into plant-usable nitrogen … mostly in the form of nitrate ($NO_3$), in charged water,"[1] mirroring the patented architecture and function.

6.     Potter and Firewater did not stop at copying Green Lightning's patented technology. They also orchestrated the poaching of approximately seventeen Green Lightning employees, induced Green Lightning employees subject to confidentiality and restrictive covenant obligations to defect, and exported Green Lightning's customer and business data for use in Firewater operations. Internal audit trails indicate significant downloads and exports of Green

---

[1] https://www.firewaterag.com/how-does-firewater-work (last visited Feb. 12, 2026)

ACTIVE 718223644v7

Lightning's records from HubSpot, a customer relationship management ("CRM") software, as well as other corporate data during the same period. These actions were subsequently followed by targeted solicitations directed at Green Lightning's customers and partners.

7.    Firewater engaged in a calculated and deceitful campaign to pass off Green Lightning's customer success as its own. Specifically, Firewater took numerous Green Lightning marketing videos capturing conversations with at least one farmer about their success using Green Lightning machines and republished them under the Firewater brand. In a blatantly deceiving fashion, Firewater bleeped out any "Green Lightning" reference while simultaneously overlaying the Firewater logo on the speaker's face when they say "Green Lightning" in several marketing Instagram Videos. *See* IG Video 1 (Ex. 3); IG Video 2 (Ex. 4); IG Video 3 (Ex. 5).[2] These manipulated videos, which have been and continue to be viewed and liked on social media, create the false impression that the farmers were endorsing Firewater and that Firewater was the source of the documented results. The edits misrepresent origin, sponsorship, and affiliation, and are likely to mislead a consequential segment of the relevant purchasing public.

8.    Not only were these uses of the videos misleading, but, on information and belief, Potter directed or caused these Green Lightning videos to be taken down from Green Lightning's website and social media channels and caused deceptively doctored versions to be distributed through Firewater-controlled websites and social media accounts. This conduct deprives Green Lightning of its own marketing materials, actively hobbles Green Lightning's ongoing promotional efforts during a key purchasing cycle, and simultaneously disseminates false and misleading advertising under the Firewater brand.

---

[2] The attached Exhibits 3-5, 7, and 14 include screenshots from the relevant videos with the associated collection information and metadata. The complete video files have been forensically imaged and authenticated. *See* Wayne Baker Declaration (Ex. 24, pp. 3-4). These videos can be provided to the Court upon request, via delivery of a thumb drive or other suitable electronic medium.

4

9.      Firewater has also misused Green Lightning's brand and content in other ways to sow confusion in the marketplace. Upon information and belief, Potter has told Green Lightning customers that Green Lightning is "out of business" and that their only option is Firewater. Furthermore, on or about January 27, 2026, a Green Lightning employee encountered Tom Dykstra, who was previously a paid consultant to Green Lightning[3] and is now working for Firewater[4] and featured prominently in its marketing videos. Dykstra stated that, according to Potter, Lewis "mishandled" the company, engaged in a "hostile takeover," and that Firewater's product is "three times better" than Green Lightning's. These accusations are false and particularly damaging: Potter's deception has turned a former Green Lightning scientific consultant, whose affiliation and visibility in Green Lightning's materials (*see* "Soil Health With GL" Post, Ex. 6) convey authority in the eyes of growers, into a mouthpiece for Firewater (*see* "How to Revive Your Soil" Video, Ex. 7), thereby lending undue credibility to Firewater's products and amplifying confusion in the marketplace.

10.     And, in written outreach to Green Lightning stakeholders, Firewater's Global Expansion Leader (Vaders) stated: "Wanted to let you know that we have moved global distribution of machines under a new name: Firewater Ag LLC." Vaders Marketing Email (Ex. 8). These false and misleading statements, disseminated in interstate commerce, constitute false advertising under the Lanham Act and have caused material harm to Green Lightning's reputation and sales.

11.     Further, on or about January 27, 2026, Lewis spoke by phone with Michael Lyne of Lyne Contracting in Australia, a long-standing Green Lightning distribution account, who reported that, just before Christmas 2025, Potter told him Green Lightning would "not be handling

---

[3] https://dykstralabs.com/?s=green+lightning (last visited Feb. 12, 2026).
[4] https://dykstralabs.com/?s=firewater (last visited Feb. 12, 2026).

ACTIVE 718223644v7

any export sales" and that Firewater would "handle export moving forward." Lyne also confirmed an outstanding balance of approximately USD $770,000 owed to Green Lightning for systems Potter sold prior to his departure. Email re Lyne call (Ex. 9). These statements reinforced the false impression that Green Lightning had ceased operations and that distribution had been moved to Firewater, causing confusion, diverting orders, and impairing Green Lightning's goodwill.

12.    Lyne further confirmed Potter had directed that future orders would be placed with Firewater and not Green Lightning, and he repeated Potter's assertion that Green Lightning would not be handling any export sales in the long term. Lyne is a long-standing distributor relationship; Potter's statements materially confused the market and diverted Green Lightning's pending orders in Australia.

13.    Potter also exploited his control over Green Lightning's finances. He commingled his personal funds with those of Green Lightning and diverted company assets for personal use, paid himself and family members excessive compensation, and implemented unauthorized sales practices that exposed the company to substantial refund liability, all while depriving core operations and research and development of necessary resources. Green Lightning's financial records show more than $1,000,000 in unapproved payments and personal expenditures, the opening of a bank account using a forged signature of Lewis, and other conversions of company assets.

14.    Further, without authorization, Potter implemented and promoted a written one-year, no-questions-asked "full refund" guarantee to induce purchases of Green Lightning machines, a program that imposed virtually no restrictions and materially increased Green Lightning's refund exposure. Potter used guaranteed sales to record commissions even where sales were induced by the refund promise, compounding Green Lightning's refund liabilities. Multiple

ACTIVE 718223644v7

side letters promising returns 'for any reason' were disseminated to customers, creating systemic exposure and undermining cashflow. Green Lightning's accounting records show refund lines such as 'Refund_Machine' including at least $44,000 and additional refund-related expenses. On information and belief, Potter further used these guaranteed sales to book commissions, compounding Green Lightning's liabilities, and he failed to disclose the magnitude of these refund obligations to management and investors.

15.    As a result of Defendants' misconduct, Green Lightning has suffered, and absent relief will continue to suffer, irreparable harm, including loss of trade secret protection, diversion of customers and revenue, impairment of goodwill, and degradation of its competitive position in a nascent market its innovations helped create.

16.    Plaintiffs bring this action directly and derivatively on behalf of Green Lightning to stop Defendants' ongoing violations and to recover damages. Plaintiffs assert claims for breach of fiduciary duty, aiding and abetting, conversion, misappropriation under the Defend Trade Secrets Act ("DTSA") and the Kentucky Uniform Trade Secrets Act ("KUTS"), false advertising under the Lanham Act, patent infringement of the '803 Patent, trademark infringement, fraudulent misrepresentation, tortious interference with contract and business relations, usurpation of corporate opportunities, unfair competition, breach of contract, unjust enrichment, and civil conspiracy.

17.    Plaintiffs seek preliminary and permanent injunctive relief prohibiting further misuse and disclosure of Green Lightning's proprietary information; enjoining Defendants from making, using, offering for sale, or selling infringing products; halting false advertising and other unfair competitive acts; and compelling the return of all Green Lightning property. Plaintiffs also seek compensatory, exemplary, punitive, and treble damages as authorized by law; disgorgement

of profits; attorneys' fees and costs; and such other and further relief as the Court deems just and proper.

## II.    THE PARTIES

18.    Altrus Capital - Eco, LP is a limited partnership organized under the laws of the state of Delaware with a certificate of authority to conduct business in the Commonwealth of Kentucky. At all times relevant to this Complaint, Altrus Capital - Eco, LP has been a member of Green Lightning and adequately represents the interests of the company in enforcing its rights. Altrus Capital - Eco, LP brings this action both directly and derivatively.

19.    Altrus Capital - Green Lightning, LP is a limited partnership organized under the laws of the state of Delaware with a certificate of authority to conduct business in the Commonwealth of Kentucky. At all times relevant to this Complaint, Altrus Capital - Green Lightning, LP has been a member of Green Lightning and adequately represents the interests of the company in enforcing its rights. Altrus Capital - Green Lightning, LP brings this action both directly and derivatively.

20.    Lewis is an individual who resides in Clark County, Kentucky and serves as a Member, Manager, and employee of Green Lightning. At all times relevant to this Complaint, Lewis has been a member of Green Lightning and adequately represents the interests of the company in enforcing its rights. Lewis brings this action both directly and derivatively.

21.    Defendant Firewater is a limited liability company organized under the laws of the Commonwealth of Kentucky on July 28, 2025, by Potter while Potter was a Member, Manager, and employee of Green Lightning. Potter serves as Firewater's registered agent and Potter has identified his personal residence located at 1747 Bethlehem Road, Paris, KY 40361 as Firewater's location for purposes of service of process and its principal place of business.

ACTIVE 718223644v7

22.     Based on information and belief, Awesome is an Indian company that Vaders formed on January 4, 2025 to handle international marketing and sales for Firewater in India. Based on information and belief, Awesome's registered address is H.No. 7-111, KK Nagar 1, Gandamguda, Hydersha Kote Hydershahkote Hyderabad Telangana India 500091 and may be served through the Hague Convention at its registered address.

23.     Based on information and belief, Firewater UK is a United Kingdom company and affiliate and/or partner of Firewater. Firewater UK's principal office located at Bielsbeck Farm, Market Weighton, York, East Yorkshire 07834 068252 and can be served through the Hague Convention at its principal office location.

24.     Potter is an individual who resides and can be served at 1747 Bethlehem Road, Paris, KY 40361 and, as detailed here, has conducted business in Clark County, Kentucky in his roles as a Member, Manager, and employee of Green Lightning.

25.     Ryelee is the daughter of Travis Potter and was employed by Green Lightning under his supervision. Service may be made at Ryelee's current residential address at 1747 Bethlehem Road, Paris, KY 40361.

26.     Lilley was employed by Green Lightning, with payroll records reflecting a salaried position through 2024 and into 2025. Service may be made at Lilley's last known residential address at 150 Duncan Avenue, Paris, KY 40361.

27.     VanderHyde was employed by Green Lightning, and service may be made at VanderHyde's last known residential address at 11393 Grange Avenue, Sparta, MI 49345.

28.     Vaders served Green Lightning in international expansion and distribution (including Australia) and was copied on numerous logistics and order communications as "Global Expansion Operations." Service may be made at 1747 Bethlehem Road, Paris, KY 40361.

9

29.     Obeng-Mayaresa was employed by Green Lightning as Regional Manager for Africa and the Caribbean. Service may be made at Obeng-Mayaresa's last known residential address at 9409 Chippenham Dr, Laurel, MD 20723.

30.     Smith (through his entity, Blessings) entered an Employment Agreement dated May 8, 2024, to serve as Plant Manager for Green Lightning's manufacturing plant. Service may be made at Smith's last known residential address at 491 Iron Works Road, Paris, KY 40361.

31.     Blessings is a limited liability company organized under the laws of the Commonwealth of Kentucky, with its principal office located at 1912 Bethlehem Rd., Paris, KY 40316. Blessings may be served through its registered agent, Benjamin David Smith, at 1912 Bethlehem Rd., Paris, KY 40361.

32.     Nominal Defendant Green Lightning is a limited liability company organized under the laws of the Commonwealth of Kentucky with its principal office located at 1 Walle Dr., Winchester, KY 40391. As detailed below, the Green Lightning Operating Agreement vests authority to prosecute and defend lawsuits in the Managers—Potter and Lewis—acting jointly. Therefore, a demand on the company to pursue the claims set forth herein would be futile because it would require the wrongdoer—Potter—to consent. For these reasons, Altrus and Lewis are authorized to pursue the claims herein derivatively and Green Lightning is named only as a nominal defendant.

### III.     JURISDICTION AND VENUE

33.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the federal DTSA (18 U.S.C. § 1836), the Lanham Act (15 U.S.C. §§ 1051 *et seq*.), and pursuant to 28 U.S.C. §§ 1331 and 1338 because this action arises

10

under the patent laws of the United States (35 U.S.C. §§ 1 *et seq.*). This Court has subject matter jurisdiction over the remaining claims under 28 U.S.C. § 1367.

34.     This Court has personal jurisdiction over Defendants because, among other reasons, (a) Defendants reside, conduct business, are employed, and/or have sufficient minimum contacts with the Commonwealth of Kentucky; (b) the Defendants have misappropriated, disclosed, and/or used Green Lightning's trade secrets in the Commonwealth of Kentucky; (c) the Defendants have engaged in false advertising in the Commonwealth of Kentucky; (d) the Defendants have knowingly interfered with contractual relationships in the Commonwealth of Kentucky; and/or (e) the Defendants have otherwise caused injury to Green Lightning in the Commonwealth of Kentucky. Further, the exercise of jurisdiction over the Defendants comports with federal due process.

35.     Venue is proper under 28 U.S.C. § 1391(b) because Defendants reside in the Eastern District of Kentucky, a substantial part of the events or omissions giving rise to the claims occurred here, and the Defendants are subject to personal jurisdiction here. Venue for the patent infringement claim is proper under 28 U.S.C. § 1400(b) because Firewater resides in Kentucky and has made, used, offered to sell, and/or sold the accused systems in this District.

36.     All conditions precedent to this action have been performed or have occurred or have been waived.

## IV.    FACTUAL ALLEGATIONS

### A.  Green Lightning's Corporate History and Business.

37.     In April 2024, Potter and Lewis formed Green Lightning to develop and commercialize technologies that were invented by Lewis and that are subject to numerous

domestic and international intellectual property protections. Lewis was the inventor of the technology and Potter was to help run the business operations.

38.    Green Lightning's technology, referred to as the "Nitrogen Machine," consists of a cutting-edge system that produces fertilizer directly on the farm. The machine uses plasma technology to extract nitrogen from air and water, which is then used to create a liquid fertilizer solution that crops can absorb. This innovation reduces waste, saves farmers money, and enables targeted crop evaluation and fertilization without blanket application across entire fields.

39.    Green Lightning's Operating Agreement provides that Potter and Lewis are the two Managers of the company. The Operating Agreement further provides that the Managers "shall not act independently of each other." Operating Agreement § 3.02 (Managers' Rights) (Ex. 1). Thus, because Potter and Lewis are both identified as Managers, they are required to act jointly, and unilateral action is prohibited. Lewis led technical R&D, authored engineering drawings, and is the named inventor on the '803 Patent. Potter oversaw daily operations, sales, and finances; he did not author core technical designs, schematics, control code, or reactor architecture.

**B. Potter's Operational and Governance Failures.**

40.    Despite explicit directives and the Operating Agreement's requirement of joint management, Potter repeatedly acted unilaterally in ways that exposed Green Lightning to foreseeable operational, legal, and reputational harm. For example, he authorized outbound shipments of machines without providing operating instructions or commissioning support and failed to follow compliance controls such as gathering NDAs, non-competes, and signed employment agreements for staff and distributors. *See* Ex. 10 (Email from Lewis to Potter re: "GLS health and status," reiterating halt on international shipments and need for structure and planning).

ACTIVE 718223644v7

41.    Potter shipped machines internationally in defiance of a temporary, company-wide halt expressly imposed to protect Green Lightning's intellectual property posture while global IP protections were accelerated, thereby forcing the company into costly, reactive IP triage.

42.    Potter acknowledged both the export halt and repeated warnings yet pressed ahead with shipping to Australia and other jurisdictions, arguing cashflow justifications over express governance and IP risk constraints.

43.    On July 1, 2024, Potter likewise unilaterally executed a "global expansion" agreement with Vaders (Ex. 11) that obligated Green Lightning to a $100,000 base, a $30,000 annual "travel fund," open-ended commissions outside the U.S./Canada, and access to international distributor lists, pricing, and trial data—without Lewis's knowledge or consent. On March 1, 2025, he likewise executed an outsized employment agreement with Obeng-Mayaresa (Ex. 12), committing Green Lightning to an $80,000 base salary and commissions, again without joint approval. These significant contracts were presented as *faits accomplis* and approved by no one but Potter, exemplifying his abuse of authority, imposing significant international obligations and exposing proprietary expansion strategy, in direct violation of the Operating Agreement's joint-action rule (Operating Agreement § 3.02), its spending/licensing limits (Operating Agreement § 3.03), and his independent fiduciary duties of loyalty and care.

44.    Both the Vaders and Obeng-Mayaresa agreements include non-solicitation and twelve-month non-compete covenants that prohibit competitive activity and solicitation of Green Lightning's customers and employees following their engagement. Upon information and belief, Vaders and Obeng-Mayaresa are now employed by Firewater in roles that violate these post-engagement restrictions, thereby breaching their covenants and further exposing Green Lightning's customer relationships and proprietary information.

13

45.     In addition to this, Potter, without knowledge and permission from Lewis, commingled his personal finances with Green Lightning's. Based on information and belief, Potter also used Green Lightning's funds for personal expenses, which include: (i) large Airbnb charges for family vacation stays exceeding $35,000 across three stays; (ii) Delta Airlines travel charges covering multiple family members, not limited to employees; (iii) purchase of vehicles for personal use; and (iv) a $71,186 payment to Heritage Sheep Reproduction (sheep semen and embryos) for Potter's personal farm. These expenditures were unrelated to Green Lightning's business and were charged to Green Lightning accounts while Potter controlled disbursements.

### C.  Green Lightning's Innovation History and Patents.

46.     Lewis conceived and developed the on-farm plasma approach to generating nitrogen fertilizer well before Green Lightning was formed. Lewis spent many years of work in the development of an assortment of plasma-based technologies ranging from diesel emissions control to nitrate fertilizer production. These efforts are linked by a common purpose for Lewis— an intense desire to improve our planet or, to use an old axiom, to leave it better than we found it.

47.     Green Lightning is the manifestation of that desire. The motivation is environmental and practical, as a new plasma produced version of agricultural nitrogen will have a small fraction of the carbon footprint than that of the traditional methods using heat and hydrocarbons, it will be cleaner to use leaving no toxic footprint on our landscape, plants will respond to it better than to synthetic nitrate salt compounds, and it will help to restore soil fertility.

48.     Building on that mission, Lewis captured the architecture of his on-farm plasma approach in a number of patent applications and issued patents, including the '803 Patent. The '803 Patent claims an apparatus and method directed to generating a concentrated nitrogen solution for plant growth. '803 Patent, cover page and claim 1 (Ex. 13). As recited in claim 1, the apparatus

14

includes: (1) a modular plasma reactor capable of generating a concentrated nitrogen solution for plant growth, (2) a housing surrounding the plasma reactor, (3) an ignition unit removably connected to the plasma reactor, (4) one or more injectors removably connected to the modular plasma reactor in fluidic connection with at least one reservoir and further comprising one or more valves configured to monitor, control, or otherwise regulate the flow of fluid to the plasma reactor, (5) at least one reservoir removably connected to the injector, (6) a condenser configured to collect reactive products generated from electric discharge within the modular plasma reactor placed between the electric discharge and a growth medium for the plant growth, and (7) a controller communicatively connected to one or more of the ignition unit and the injector.

**D.  International IP Exposure and Remediation Costs.**

49.    Potter's unauthorized shipments into multiple countries materially increased Green Lightning's IP exposure and forced immediate engagement of foreign counsel and accelerated filings at significantly higher cost than would have been incurred under the planned, phased strategy.

50.    The list of countries into which Green Lightning's systems were shipped or targeted, including Australia, New Zealand, India, Hungary, Pakistan, and others, was documented by Potter and highlights the breadth of exposure created by unilateral export activity.

**E.  Firewater Infringes the '803 Patent with its 7-Thunders System.**

51.    Potter is not an inventor and does not have a technical background. However, he recently founded Firewater using technology that includes an identical plasma reactor type to Green Lightning—technology that took Lewis many years to develop. The Firewater technology is called the "7-Thunders" system.

ACTIVE 718223644v7

52.    Firewater claims that "[t]he 7-Thunders Firewater system is a highly efficient unit with seven plasma reactors, designed for optimal production and consistency in producing a nitrogen-rich, highly energized solution for your farm."[5]

53.    7-Thunders is offered for sale on Firewater's website:



**Figure 1**

54.    As an initial matter, 7-Thunders is assembled from modules that are "removably connected." The '803 Patent explains "removably connected" as meaning "an ability for an object that is connected to another object to be disconnected from the other object without damaging or breaking said objects." Ex. 13, 5:42–45. The specification provides non-limiting examples of removable connections (*e.g.*, threaded connections, plug-and-socket mates, pogo pin contacts, bayonet connections, snap-fit connections, latch connections, hose clamps, shaft collars, adapters, welding, soldering, and adhesive bonding, etc.) that permit disassembly and replacement of subassemblies and interfaces (fluidic and electrical) without damage. Ex. 13, 5:42–6:61; 9:15–25.

---

[5] https://www.firewaterag.com/products (last visited Feb. 12, 2026).

ACTIVE 718223644v7

55.    The 7-Thunders system embodies each of the seven components recited in claim 1:

(1) ***a modular plasma reactor capable of generating a concentrated nitrogen solution for plant growth***. According to the '803 Patent, "[f]or the purposes of this disclosure, a 'modular plasma reactor' is a plasma reactor that can be removably connected to other modules." Ex. 13, 6:38-41. Firewater's 7-Thunders system uses seven plasma reactors, not a single unit. Furthermore, the claimed modularity (*i.e.*, removable connectability) is inherent in a commercially viable multi-reactor system, especially one that touts "tackling maintenance issues."[6] The claimed modularity is also evident in Firewater's Future of Farming video, with three of the modular plasma reactors shown in the foreground of this frame (others are shown in the background, and the housing can be seen surrounding the reactors):



**Figure 2A**                    **Figure 2B**

Not only does Firewater move water "through a series of reactors" where "nitrogen in the air is converted into plant-available fertilizer," Firewater copies the exact core

---

[6] On December 9, 2025, Firewater's Global Expansion Leader, Vaders, stated: "Under this brand we are developing a new series of machines better equipped for shipping and global electrical standards. Also tackling maintenance issues, by making a more robust model, producing a better quality product!" Ex. 8.

technology used by Green Lightning—gliding arc[7] plasma reactors—as disclosed and

covered by the claims in the '803 Patent. As explained in the '803 Patent, "[i]n a non-

limiting example, at least a pair of electrodes 220 a-b may be arranged in a diverging

configuration (i.e., in a gliding arc discharge)." Ex. 13, 24:55-56.

(2) ***a housing surrounding the plasma reactor***. The Future of Farming video shows the

7-Thunders enclosure being opened to reveal the plasma reactors inside, confirming

that the reactors are situated within a housing. *See* Figure 2A, a screenshot from Ex.

14.

(3) ***an ignition unit removably connected to the plasma reactor***. The '803 Patent explains

that, "as used in this disclosure, an 'ignition unit' is an electrical component responsible

for supplying an initial electrical voltage necessary to initiate electrical discharge

between electrodes." Ex. 13, *7:64-67*. The Future of Farming video shows an electrical

discharge *(*i.e., arc) between two electrodes in the plasma reactors (*see* Figures 2A and

2B, both screenshots from Ex. 14), which requires an electrical component responsible

for supplying an electrical voltage (*i.e.*, an ignition unit).

---

[7] Gliding arc discharge is a high–energy density plasma with elevated operating temperatures and severe electrode wear, making it the most challenging plasma modality to commercialize. Lewis selected gliding arc precisely because it produces the highest yields of reactive nitrogen species and then spent years engineering proprietary solutions to mitigate heat and electrode erosion, including using water inside the reactor both to absorb and transfer gas-phase nitrogen oxides into liquid and to cool the ignition and ground electrodes, thereby dramatically reducing electrode depreciation. Green Lightning has the only known commercial technology implementing this wet gliding arc configuration for on-farm nitrate production, and upon information and belief, Potter had no independent source for this approach other than his misappropriate of Green Lightning's intellectual property.

ACTIVE 718223644v7



**Figure 3 (Screenshot from Ex. 14)**

(4) ***one or more injectors removably connected to the modular plasma reactor in fluidic connection with at least one reservoir and further comprising one or more valves configured to monitor, control or otherwise regulate the flow of fluid to the plasma reactor***. The '803 Patent explains that, "[a]s used in this disclosure, an 'injector' is a component designed to introduce at least a fluid into a plasma reactor." Ex. 13, 9:60-65. The Future of Farming video shows a water inlet coupled to a water reservoir. *See* Figures 3, 4, and 5. In other words, this video shows and describes a water delivery system in fluidic connection with a water source (*i.e.*, reservoir) that delivers water to the plasma chambers through a series of filters and valves that control the flow of fluid to the plasma reactor. Thus, 7-Thunders includes a component designed to introduce water into the reactor (*i.e.*, an injector). Furthermore, the video shows that the components of 7-Thunders are assembled with removable connections.

19

(5) *at least one reservoir removably connected to the injector*. The '803 Patent explains that "[a]s used in this disclosure a 'reservoir' is a container or storage chamber designed to hold at least a fluid." Ex. 13, 11:55-56. Firewater's machines include at least one container removably connected to the injector, as shown and explained in the Future of Farming video. *See* Figures 4 and 5.



**Figure 4 (Screenshot from Ex. 14)**

(6) *a condenser configured to collect reactive products generated from electric discharge within the modular plasma reactor placed between the electric discharge and a growth medium for the plant growth*. The specification of the '803 Patent explains that, "[a]s used in this disclosure, a 'condenser' is a component configured to collect reactive products [*i.e.*, nitrogen] generated from electric discharge within [a] reaction region of [a] plasma reactor 216." Ex. 13, 29:3-6. The Future of Farming video shows the system output being drawn directly from the machine's condenser outlet after plasma discharge within the reactors and depicts the downstream collection pathway from the reaction region to the condenser outlet. Thus, 7-Thunders includes a

ACTIVE 718223644v7

component (*i.e.*, a condenser) configured to collect reactive products (i.e., reactive nitrogen species) generated within the plasma reactor.

(7) ***a controller communicatively connected to one or more of the ignition unit and the injector***. As explained in the '803 specification, "[f]or the purposes of this disclosure, a controller is a system that manages and regulates operations related to a plasma reactor." Ex. 13, *8:40-67*. To function in the manner described by Firewater, 7-Thunders necessarily has a way to control electrical discharge (*i.e.,* the ignition units supplying voltage to the plasma reactor electrodes) and to control water introduction (*i.e.*, the injectors that introduce water into the plasma reactors), and on information and belief the controllers shown in Figure 5 provide at least this functionality.



**Figure 5**

## F.  Green Lightning's Confidential Proprietary Information and Trade Secrets.

56.  Green Lightning successfully competes for business in the liquid fertilizer market and maintains its customer relationships in part because of the confidential information,

proprietary information, and trade secrets that Green Lightning has spent substantial time, money, and other resources investing in, testing, and developing. Green Lightning's confidential, proprietary, and trade secret information is essential for it to compete. This information is not shared with or known through proper means by Green Lightning's competitors. It is likewise not reasonably ascertainable by those competitors without significant expenditure and years of effort.

57.    Green Lightning considers and treats the following as its confidential information, proprietary information, and trade secrets (referred to throughout as "<u>Proprietary Information</u>"):

a.  All internal business information, procedures, and policies, including, but not limited to, business plans, financial information, budgets, forecasts, product margins, product costs, service and/or operation manuals and related documentation (including drawings), and other such information that relates to the way that Green Lightning conducts its business, sales, and services.

b.  All plans and/or discussions regarding proposed advertising, public relations, and promotional campaigns;

c.  Vendor names, vendor pricing, and other vendor information;

d.  All customer sales and marketing information, including, but not limited to, sales and marketing studies, sales forecasts, marketing and sales promotion plans, product launch plans, sales call reports, and competitive intelligence information;

e.  All internal price lists, discount matrices, pricing calculators, and pricing strategies;

f.  All customer lists and corresponding information about customer contacts;

g.  All ambassador lists and corresponding information about ambassador contacts;

h.  Prospective customer information;

i.  All Green Lightning employee company (*i.e.*, non-personal) information, including, but not limited to, internal organization, lists of employees or consultants, phone lists, employee compensation, and any other information regarding Green Lightning's employees or consultants;

j.  All technical and R&D materials;

k.  All product and process know-how;

l.  All supply-chain and operations information, including supplier lists, part numbers, pricing, lead times, sourcing strategies, logistics plans, inventory levels, warehouse locations, shipment routes, export documentation, and commissioning checklists; and

m.  All market and strategic materials, including go-to-market plans, territory maps, distributor networks, channel strategies, global expansion plans, trial sites and results, case studies, testimonials, and competitive analyses.

58.  Green Lightning maintains a comprehensive Employee Handbook governing confidentiality, conduct, compliance, and use of company property and information. *See* Ex. 15 (Employee Handbook). As a further condition of employment, all employees are required to review, acknowledge, and agree to the terms of the Employee Handbook, which expressly prohibits the unauthorized disclosure or use of Green Lightning's Proprietary Information:

**Confidentiality Agreement**

The Employee shall not (i) disclose to any third party any details regarding the business of Green Lightning, Solutions, including, without limitation, the names of any of its customers, the prices it obtains, the prices at which it sells products, its manner of operation, its plans, its strategies, any of Green Lightning, Solutions' trade secrets or any other information pertaining to the business of Green Lightning, Solutions (the "Confidential Information"), (ii) make copies of any Confidential Information or any content based on the concepts contained within the Confidential Information for personal use or for distribution unless requested to do so by the Company, or (iii) use Confidential Information other than solely for the benefit of the Company.

59.  The Employee Handbook also explains that signing a Non-Disclosure Agreement (NDA) is a condition of employment.

**Non-Disclosure Agreement (NDA)**

All employees of Green Lightning will be required to sign a Non-Disclosure Agreement (NDA) as a condition of employment. The NDA prohibits the disclosure of confidential information and protects the proprietary interests of the company. Failure to comply with the terms of the NDA may result in legal action as well as termination.

ACTIVE 718223644v7

60.    One of Potter's responsibilities was ensuring that Green Lightning's employees reviewed the Employee Handbook and signed the required NDA (the "NDA"). A copy of the template NDA is attached hereto as Ex. 16.

61.    The Green Lightning NDA includes a non-disclosure provision. Specifically, the NDA provides:

> **B**. EMPLOYEE agrees to receive such INFORMATION and to refrain from copying, disclosing, using, selling, or offering for sale any or all of said INFORMATION, except at the request of THE COMPANY, and subject to the exceptions provided in paragraph C herein. EMPLOYEE further agrees to maintain the confidentiality of all INFORMATION and to take all necessary and reasonable steps to prevent unauthorized disclosure or use.

62.    The NDA also includes a non-compete provision. Specifically, the NDA provides:

> EMPLOYEE acknowledges and recognizes the highly competitive nature of the Company's business and agrees that EMPLOYEE's duties under this Agreement justify reasonable restrictions on subsequent employment following the termination of this Agreement. EMPLOYEE agrees that, except when acting with the prior written consent of the Company:
> - (i) For a period of two (2) years following the termination of this Agreement, EMPLOYEE shall not induce or attempt to induce any customer, agent, or other business contact under contract with or doing business with the Company to terminate, reduce, alter, or divert business away from the Company.
> - (ii) For a period of one (1) year following the termination of this Agreement, EMPLOYEE shall not, directly or indirectly, in any professional or business capacity, engage or participate in any business that competes in any manner with the Company in any market where the Company currently operates or has publicly announced plans to operate.

63.    The NDA also includes a specific provision under which the employees agreed Green Lightning is entitled to injunctive relief. Specifically, the NDA provides:

> EMPLOYEE agrees that any breach of this Agreement would cause irreparable harm. THE COMPANY is entitled to injunctive relief and monetary damages.

64.    All the Defendants employed by Green Lightning expressly or impliedly agreed to the non-competition and non-solicitation provisions in the NDA.

65.    Each of the Defendants employed by Green Lightning, by virtue of his or her role at Green Lightning, had access to one or more categories of Green Lightning's Proprietary

24

Information described above, including customer and ambassador lists, technical and manufacturing know-how, CRM and financial data, and internal pricing and strategy materials.

### G. Potter Forms Firewater and Recruits Green Lightning's Employees to Compete Unfairly.

66.    Based on information and belief, Firewater's international rollout involves a related entity in India formed and controlled by Vaders while he was employed by Green Lightning and leading Green Lightning's international efforts under Potter. Corporate records show that Awesome was incorporated on January 4, 2025 in India and maintains an active website that advertises Firewater machines and offerings, mirroring Firewater's social media and other marketing efforts, and showing the coordinated effort to market and distribute Firewater's competing systems abroad began as early as the beginning of 2025, months before any separation discussions began with Potter.

67.    Then, on July 28, 2025, Potter incorporated Firewater with the Kentucky Secretary of State. That same day, the domain "firewaterag.com" was registered by Narrow Road Threads + Co., an entity organized by Potter's daughter, Ryelee Potter, evidencing coordinated preparations to launch a competing venture while Potter remained in his Green Lightning fiduciary and management roles. *See* Ex. 17 (Ky. Secretary of State records for Firewater Ag, LLC); Ex. 18 (WHOIS/registrar record for firewaterag.com showing July 28, 2025 registration by Narrow Road Threads + Co.).

68.    These actions were taken without co-manager consent, in breach of Green Lightning's Operating Agreement, and in violation of Potter's fiduciary duties of loyalty and care. *See* Ex. 1 (§§ 3.02 (joint action required), 3.03 (specific limitations on manager authority)).

69.    Furthermore, on information and belief, multiple employees who had access to Green Lightning's Proprietary Information joined Firewater and began performing substantially

similar roles, leveraging know-how and relationships acquired at Green Lightning. Weeks after the formation of Firewater, Green Lightning employees began exporting Green Lightning's CRM datasets before joining Firewater, and Firewater began representing to international stakeholders that global distribution had "moved" to Firewater. *See* Ex. 19 (HubSpot Export Audit — Lilley: August 6 and 13, 2025 exports of "All Contacts," "Companies," "Customers");[8] Ex. 20 (HubSpot Export Audit — VanderHyde: October 28, 2025 export of 4,518 "All Contacts"); Ex. 8 (July 9, 2025 email stating "we have moved global distribution of machines under a new name: Firewater Ag LLC").

70.     As another example, Blessings (through Smith) served as Plant Manager at Green Lightning through approximately September 2025. On information and belief, Blessings or Smith now holds a comparable plant-management role at Firewater. Blessings's Employment Agreement dated May 8, 2024 (Ex. 21) includes a confidentiality covenant that expressly prohibits him from disclosing, "during or after employment," any confidential or proprietary information related to Green Lightning's operations, products, customers, financials, or business affairs; those obligations survive its separation from Green Lightning. Thus, if Blessings or its agent, Smith, is employed by Firewater, Blessings is in violation of its employment agreement.

71.     On February 10, 2026, Plaintiffs discovered a newly launched Firewater United Kingdom website and sales channel promoting accused plasma systems and related services to UK distributors and growers.[9] The site includes UK-targeted product pages, emphasizes Firewater's rapidly expanding infringing sales with "over 1000 PAW [plasma activated water] units on farm

---

[8] The attached Exhibits 19 and 20 show downloads from HubSpot, which have been forensically validated and authenticated. *See* Wayne Baker Declaration (Ex. 24, p. 7).
[9] https://www.firewaterag.uk/ (last accessed Feb. 12, 2026)

across America and Canada,"[10] and cross-links to Firewater's marketing videos,[11] evidencing rapid international distribution of Firewater's U.S.-made systems into foreign markets. This escalation increases the risk of domestic offers and sales tied to foreign delivery and underscores the urgency of immediate injunctive relief to preserve the status quo and prevent further diversion and harm.

### H.  Potter's White-Label Ruse.

72.      Beginning in late August/early September 2025, Lewis and other Green Lightning investors—seeking to remove Potter due to his gross mismanagement and misuse of Company funds—were nevertheless willing to come to the table to avoid immediate litigation, and the parties discussed a potential separation framework under which certain, limited personnel would transition to a contemplated "NuCo" focused on non-U.S. sales of Green Lightning technology while Green Lightning retained a defined core team. As reflected in those discussions, Lewis identified approximately 17 individuals to remain with Green Lightning and understood that a subset of others could depart with NuCo. Those discussions were expressly non-binding, were conditioned on numerous prerequisites (including IP controls, cost-plus critical components from Green Lightning, reimbursement and bond obligations, and a clean separation of brands), and were never finalized or performed. In all events, no consent was given to solicit broadly, to remove or use Green Lightning's data, to take down Green Lightning's marketing videos, or to compete using Green Lightning's proprietary technology or brand. To the extent any personnel transitions were contemplated, Defendants far exceeded the scope and timing of any such contemplated transitions.

73.      Further, Potter did not negotiate the proposed term sheet in good faith. While invoking the draft term sheet to placate management and investors, he was, unbeknownst to Green

---

[10] https://www.firewaterag.uk/2026/01/02/uk-farmers-visit-kentucky-usa-to-discover-the-huge-potential-of-plasma-activated-water/ (last accessed Feb. 12, 2026)
[11] https://www.firewaterag.uk/plasma-activated-water-paw-video/ (last accessed Feb. 12, 2026)

ACTIVE 718223644v7

Lightning, simultaneously marketing Firewater's competing machines and preparing a wholesale transition. The term sheet itself made clear that any post-separation activity by Potter was conditioned on Green Lightning's control over critical technology and parts—requiring that Potter "Must use 'Critical Components' provided and sold to NuCo from GLS," that "[Lewis is] to Identify 'Critical Components' List," with pricing "Cost plus 10% on part kits from GLS." Despite these requirements, Potter proceeded as if Firewater were independent of Green Lightning's components and IP. As a result, Green Lightning incurred more than $52,000 in attorneys' fees to develop and refine a separation framework Potter never intended to honor, compounding the damage from his deceit.

I.  **Firewater Has Been Using the Misappropriated Proprietary Information and Trademarks to Target, Solicit, and Divert the Business of Green Lightning's Customers.**

74.    On information and belief, Defendants have also misappropriated and misused Green Lightning's trademarks, branding, and marketing assets to trade on Green Lightning's goodwill and create confusion in the marketplace. Defendants further used confusingly similar marks on websites and social media channels promoting Firewater's competing machines in the same channels of trade and to the same class of purchasers as Green Lightning. Such unauthorized use of Green Lightning's marks and brand elements is likely to cause consumer confusion, mistake, or deception as to the origin, affiliation, or approval of Defendants' products and constitutes trademark misappropriation and infringement, causing damage to Green Lightning's reputation, goodwill, and sales.

75.    For example, below are the comparatively similar brand names for the two companies:

ACTIVE 718223644v7





76.     Further, Plaintiff owns all right, title, and interest in the trademark GREEN LIGHTNING, U.S. Trademark Registration No. 7,415,095, registered on June 11, 2024, covering water treatment apparatus for infusing irrigation water with liquid fertilizer in International Class 011. The registration is valid, subsisting, and owned by Plaintiff. True and correct copies of the USPTO registration certificate and current TSDR status record are attached as Ex. 22. This registered mark is shown below on the left, with the Firewater's logo being shown on the right.



77.     The Green Lightning mark is distinctive and strong, the parties' goods and services are the same or closely related and target the same agricultural customers, and Firewater's mark and branding are similar in sight and overall commercial impression, creating the false suggestion

of source, sponsorship, or affiliation. The parties market through overlapping channels (websites, social media, distributors, and direct sales) to the same purchasers, whose degree of care is not sufficient to dispel confusion in these circumstances. Firewater adopted and uses its marks with knowledge of Green Lightning's prior rights, has republished Green Lightning's content under its own branding, and has made statements implying continuity or affiliation, evidencing intent to trade on Green Lightning's goodwill. Green Lightning has received reports of marketplace confusion and diverted inquiries. Accordingly, Firewater's conduct is likely to cause confusion, mistake, and deception as to source, affiliation, or approval.

78.    On information and belief, and as reflected in audit logs from Green Lightning's HubSpot CRM, certain individual Defendants exported Green Lightning's customer and prospect datasets immediately prior to their departure for Firewater. HubSpot export audits confirm contemporaneous removal of Green Lightning's CRM datasets: Bradley Lilley executed multiple exports on August 4–13, 2025 ('All Contacts,' 'Companies,' 'Customers,' 'Form Submissions'), and Matt VanderHyde exported the complete 'All Contacts' set (4,518 records) on October 28, 2025, after leaving Green Lightning. *See* Ex. 19 and 20.

**J.    Firewater Has Been Using the Misappropriated Proprietary Information to Target, Solicit, and Divert the Business of Green Lightning's Customers.**

79.    On January 21, 2026, Green Lightning learned (via a third-party recipient) of a Firewater email marketing campaign claiming that a Bourbon County, Kentucky farmer achieved "one of the highest yields" in the county by supplementing his standard nitrogen program with Firewater ("313 Bushels of corn per acre?"). The campaign materials, which appear to be sent from Ryelee (the sender's address is ryelee@firewaterag.com), assert that the machine was operating in May, months before Firewater was organized, which did not occur until July 28, 2025. These representations are inconsistent with Firewater's formation timeline and, on information and

30

belief, reflect use of Green Lightning machines and trials rebranded as Firewater and constitute false advertising intended to mislead customers regarding Firewater's capabilities and provenance. Ex. 23 (Customer-forwarded Firewater "313 Bushels of corn per acre?" email; header showing sender ryelee@firewaterag.com; date Jan. 21, 2026).

80.    Firewater's public marketing posts similarly tout in-season performance claims that would have required Firewater machines to have been operating during the 2025 growing season (and in some cases previous seasons), yet those posts simply repurpose Green Lightning's own trials. For example, the October 3, 2025 post "Firewater: Boosting Herbicide Performance While Delivering Nitrogen" claims reduced herbicide rates with equivalent weed control using Firewater as a carrier, and the January 2026 post "Firewater on Arabica Coffee" promotes crop outcomes in coffee.

81.    Firewater's Washington State russet potato trial claims are false. Firewater's September 23, 2025 post "Firewater and potatoes" asserts that potatoes fertigated with "Firewater" at 130 gallons over four weeks via pivot irrigation out-yielded a 250-lb/acre calcium nitrate program (25.895 vs. 23.99 tons/acre), claiming Firewater machines and product were responsible for those results. Firewater, however, was not formed until July 28, 2025, and its 7-Thunders system was not commercially deployed during the 2025 growing season. The underlying Washington potato trial was conducted with Green Lightning machines and Green Lightning trial protocols; Firewater contributed no equipment or technology to that work. Firewater's rebranding of those Green Lightning trial results as "Firewater" performance is therefore knowingly false and misleading.

82.    The russet potato trial claims Firewater published on September 23, 2025 mirror, verbatim, Green Lightning's trial results. Captures of Firewater's "Firewater and potatoes" post

and Green Lightning's trial materials show identical yield figures (25.895 vs. 23.99 tons/acre), methods (pivot fertigation), timelines, and narrative framing.

**From Firewater's Website:[12]**

Two fertigated plots of Russet potatoes were evaluated under similar growing conditions:

- *Trial #1*
- Nitrogen source: *Firewater*
- Amount applied: *130 gallons (over the course of 4 weeks)*
- Application method: *Fertigation (pivot)*
- Yield: **25.895 tons/acre**

- *Trial #2*
- Nitrogen source: *Calcium nitrate*
- Amount applied: *250 lbs N*
- Application method: *Fertigation (pivot)*
- Yield: **23.99 tons/acre**

**From Green Lightning's Website:[13]**



83.     On information and belief, these outcomes touted by Firewater were generated by Green Lightning machines and trial protocols, not Firewater's, and Firewater's marketing is deceptive because it presents pre-Firewater Green Lightning results as if they were produced by Firewater's own equipment and brand. In each instance, Firewater's claims are disseminated in

---

interstate commerce (email campaign and web/social posts) and are material to purchasing decisions because they assert superior agronomic outcomes tied to Firewater brand machines operating in seasons that predate Firewater's existence. These promotions trade on Green Lightning's trial work while falsely stating that Firewater is the source of those results, confusing customers and diverting sales.

### K. Green Lightning Has Been, and Will Be, Severely and Irreparably Harmed by the Defendants' Misappropriation of Green Lightning's Proprietary Information, and Unfair Competition.

84.     Customers are confused between the two companies. Defendants have exacerbated that confusion by circulating videos and promotional materials originally created by Green Lightning with references to "Green Lightning" muted or removed and replaced with "Firewater," and by telling customers and stakeholders that global distribution has moved to "Firewater Ag, LLC." Ex. 8.

85.     On information and belief, Potter maintains exclusive control over the original source files of numerous Green Lightning marketing videos and removed, or directed their removal, from Green Lightning's website[14] and social media accounts.[15] As a result, Green Lightning cannot restore or republish these marketing materials. This loss of access to original assets compounds the ongoing harm from Defendants' misuse of Green Lightning's brand and content.

86.     Further, the Defendants' use of Green Lightning's trade secrets (including the use of Green Lightning's CRM to target Green Lightning's customers and ambassadors) is damaging

---

[14] The videos page of the Green Lightening website (https://www.greenlightning.ag/gl-videos, last visited Feb. 12, 2026), which previous showed marketing videos, now simply shows "Video unavailable."
[15] As an example, the Green Lightning YouTube playlist "Crop Health" (https://www.youtube.com/playlist?app=desktop&list=PLbcU_TSidMHe5wgcKhunwOg95_oenG-Lb, last visited Feb. 12, 2026), while showing 46 views, no longer includes any videos. It previous included, at a minimum, a conversion with Dykstra about the advantages of Green Lightning's systems for crop health.

and continuing to harm Green Lightning not only in lost sales and prospective business opportunities, but in loss of goodwill and business reputation which damages are incalculable.

87.     Moreover, Firewater's continued sale of the 7-Thunder system, which infringes on the '803 Patent, is causing irreparable harm to Green Lightning by depriving it of its status as the exclusive seller of its technology. As a result, Green Lightning is forced to compete with unauthorized products and may be compelled to reduce its prices, thereby diminishing its net profits. The full extent of these damages is impossible to determine with certainty.

88.     The cumulative effect of these acts has caused and continues to cause irreparable harm to Green Lightning, including potential loss of trade secret protection, diversion of customers and revenue, impairment of brand goodwill, and degradation of competitive position. Monetary damages alone cannot remedy the ongoing injury.

89.     With the upcoming spring planting season and associated purchasing decisions now underway, Defendants' ongoing (and continually growing) use of Green Lightning's proprietary technology, customer data, and misbranded marketing threatens to lock in further lost sales and long-term customer relationships that cannot be unwound or fully compensated by monetary damages, underscoring the need for immediate injunctive relief. Given imminent spring purchasing decisions and Potter's continuing marketplace deception, Plaintiffs seek immediate preliminary injunctive relief to prevent further diversion and lock-in of customer relationships.

## V.     CAUSES OF ACTION

### COUNT I: BREACH OF FIDUCIARY DUTY
### (Potter)

90.     The allegations in the preceding paragraphs are incorporated by reference as if set forth fully herein.

91.     As a Member, Manager, and employee of Green Lightning, Potter owes fiduciary duties of care and loyalty to Green Lightning under KRS 275.170 and other applicable laws, including Kentucky common law.

92.     On numerous occasions detailed above, Potter acted in his own self-interest to the detriment of Green Lightning, without limitation, by:

(i)     Forming and operating a competing business—Firewater—while CEO, Manager, and Member of Green Lightning;

(ii)    Operating Firewater using Green Lightning's Proprietary Information, trade secrets and patented technology;

(iii)   Diverting business opportunities away from Green Lightning;

(iv)    Misrepresenting to Green Lightning customers, vendors, and brand ambassadors that Green Lightning was no longer operating;

(v)     Hiring and excessively compensating his own relatives and engaging in an unauthorized moneyback guarantee program;

(vi)    Entering into sales agreements that enriched him but disadvantaged Green Lightning;

(vii)   Using Company funds for personal purposes;

(viii)  Wiring Company funds to himself; and

(ix)    Soliciting and hiring Green Lightning's employee(s) at Firewater and aiding and abetting those employee's breaches of their non-disclosure, non-solicit and non-compete agreements with Green Lightning.

93.     These breaches have directly and proximately caused Green Lightning to sustain damages.

94.     Potter's actions described herein have caused and, if not enjoined will continue to cause, Green Lightning irreparable harm that cannot be compensated through monetary damages alone.

ACTIVE 718223644v7

95.     Potter's actions were conducted intentionally or with oppression, fraud, or malice toward Green Lightning, entitling Green Lightning to punitive damages, the exact amount of which will be determined at trial.

### COUNT II: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Firewater, Firewater UK, Awesome, Ryelee, Lilley, VanderHyde, Vaders, Obeng-Mayaresa, Blessings, and Smith)

96.     The allegations in the preceding paragraphs are incorporated by reference as if set forth fully herein.

97.     Through the conduct detailed above, Firewater, Firewater UK, Awesome, Ryelee, Lilley, VanderHyde, Vaders, Obeng-Mayaresa, Blessings, and Smith (and potentially other agents, affiliates, and/or family members of Potter) aided and abetted in and acted in concert to or pursuant to a common design to engage in the actions alleged above, including, without limitation, aiding and abetting in Potter's breaches of fiduciary duties and Green Lightning's Operating Agreement.

98.     As a direct and proximate result of Firewater, Firewater UK, Awesome, Ryelee, Lilley, VanderHyde, Vaders, Obeng-Mayaresa, Blessings, and Smith aiding and abetting Potter's fiduciary duty breaches, Green Lightning has sustained damages and those damages are jointly and severally owed by Firewater, Firewater UK, Awesome, Ryelee, Lilley, VanderHyde, Vaders, Obeng-Mayaresa, Blessings, and Smith.

99.     Firewater's, Firewater UK's, Awesome's, Ryelee's, Lilley's, VanderHyde's, Vaders', Obeng-Mayaresa's, Blessings', and Smith's actions described herein were conducted intentionally or with oppression, fraud, or malice toward Green Lightning, entitling Green Lightning to punitive damages, the exact amount of which will be determined at trial.

## COUNT III: CONVERSION/MISAPPROPRIATION OF FUNDS AND/OR PROPERTY
### (Potter, Firewater, Ryelee, Lilley, and VanderHyde)

100.    The allegations in the preceding paragraphs are incorporated by reference as if set forth fully herein.

101.    As detailed above, Potter used Company funds for personal expenses, including to purchase land, vehicles, vacations, and animals for his farm. These personal uses included: (i) large Airbnb charges for family vacation stays exceeding $35,000 across three stays; (ii) Delta Airlines travel charges covering multiple family members, not limited to employees; (iii) purchase of vehicles for personal use; and (iv) a $71,186 payment to Heritage Sheep Reproduction (sheep semen and embryos) for Potter's personal farm. These expenditures were unrelated to Green Lightning's business and were charged to Green Lightning accounts while Potter controlled disbursements.

102.    In addition, Potter's removal, or direction to remove, Green Lightning-origin videos from Green Lightning's accounts and his retention of the original source files and related project materials constitute conversion of Green Lightning's tangible and intangible property. By exercising dominion and control over these marketing assets and depriving Green Lightning of possession and use, Potter has wrongfully interfered with Green Lightning's property rights, causing ongoing harm and loss.

103.    In addition, as detailed above, Firewater, Potter, Ryelee, Lilley, and VanderHyde have taken, used, and continue to use Green Lightning's intellectual property including trade secrets, CRM data, patented technology, and other Proprietary Information without authorization.

104.    Potter's, Firewater's, Ryelee's, Lilley's, and VanderHyde's actions have directly and proximately caused Green Lightning to sustain damages, which are jointly and severally recoverable against Potter, Firewater, Ryelee, Lilley, and VanderHyde.

37

105.    Potter's, Firewater's, Ryelee's, Lilley's, and VanderHyde's actions described herein were conducted intentionally or with oppression, fraud, or malice toward Green Lightning, entitling Green Lightning to punitive damages, the exact amount of which will be determined at trial.

## COUNT IV: FEDERAL DEFEND TRADE SECRETS ACT
### (Firewater, Potter, Ryelee, Lilley, Blessings, Smith, and VanderHyde)

106.    The allegations in the preceding paragraphs are incorporated by reference as if set forth fully herein.

107.    Green Lightning owns and possesses certain confidential, proprietary, and trade secret information, including, but not limited to, the Proprietary Information described herein.

108.    Green Lightning's Proprietary Information relates to products and services used and sold, or intended to be used and sold, in interstate or foreign commerce.

109.    Green Lightning has taken reasonable measures to keep such information secret and confidential, including by requiring its employees to enter a confidentiality and non-disclosure agreement and by limiting and password protecting access to information contained in Green Lightning's database.

110.    Due to these security measures, Green Lightning's Proprietary Information is not available for others in Green Lightning's industry to use through any legitimate means.

111.    Green Lightning's Proprietary Information derives independent economic value, both actual and potential, from not being generally known to the public and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.

112.    In violation of Green Lightning's rights, Firewater, Potter, Ryelee, Lilley, and VanderHyde have misappropriated Green Lightning's Proprietary Information in an improper and unlawful manner as alleged herein.

113.    Specifically, and without limitation, Firewater, Potter, Ryelee, Lilley, and VanderHyde acquired, disclosed, and used categories of confidential business and technical information identified above, including the contemporaneous exports of Green Lightning's CRM datasets, and the leveraging of internal supply-chain, pricing, and global expansion materials to stand up a competing distribution footprint.

114.    This misappropriation was intentional, knowing, willing, malicious, fraudulent, and oppressive.

115.    If Firewater, Potter, Ryelee, Lilley, and VanderHyde are not enjoined, they will continue to misappropriate and use Green Lightning's trade secret information to their own benefit and to Green Lightning's detriment causing Green Lightning irreparable harm that cannot be compensated fully through monetary damages alone.

116.    Green Lightning is entitled to an injunction under 18 U.S.C. § 1836(b)(3)(A) to prevent any retention, use, or threatened use or disclosure by Firewater, Potter, Ryelee, Lilley, and VanderHyde, or any one of them, of Green Lightning's Proprietary Information.

117.    Green Lightning is entitled to recover an award of damages for actual loss caused by acquisition, disclosure, or use of Green Lightning's trade secrets, including, but not limited to, lost profits, if any.

118.    Green Lightning is also entitled to recover any unjust enrichment (not already included in the calculation of actual loss) that was received by Firewater, Potter, Ryelee, Lilley,

and VanderHyde as a result of their acquisition, disclosure, or use of Green Lightning's trade secrets.

119.    Because Firewater, Potter, Ryelee, Lilley, and VanderHyde willfully and maliciously misappropriated Green Lightning's trade secrets, Green Lightning is entitled to recover an award of exemplary damages up to two times the sum of actual loss and unjust enrichment damages.

120.    Because Firewater, Potter, Ryelee, Lilley, and VanderHyde willfully and maliciously misappropriated Green Lightning's trade secrets, Green Lightning is entitled to recover an award of reasonable attorneys' fees incurred in this action.

### COUNT V: VIOLATION OF KENTUCKY UNIFORM TRADE SECRETS ACT
### (Firewater, Potter, Ryelee, Lilley, Blessings, Smith, and VanderHyde)

121.    The allegations in the preceding paragraphs are incorporated by reference as if set forth fully herein.

122.    Green Lightning owns trade secrets falling within the ambit of KRS 365.880, *et seq*. Such trade secrets include customer lists, ambassador lists, financial documentation, etc.

123.    As detailed above, Firewater, Potter, Ryelee, Lilley, Blessings, Smith, and VanderHyde are willfully and maliciously using these trade secrets in bad faith for their own personal benefit without receiving authorization from Green Lightning.

124.    Specifically, and without limitation, Firewater, Potter, Ryelee, Lilley, Blessings, Smith, and VanderHyde acquired, disclosed, and used categories of confidential business and technical information identified above, including the contemporaneous exports of Green Lightning's CRM datasets, and the leveraging of internal supply-chain, pricing, and global expansion materials to stand up a competing distribution footprint. The misappropriation was intentional, knowing, willing, malicious, fraudulent, and oppressive.

125.    Firewater's, Potter's, Ryelee's, Lilley's, Blessings', Smith's and VanderHyde's use of the trade secrets has caused and is continuing to cause Green Lightning irreparable harm and economic loss entitling Green Lightning to injunctive relief under KRS 365.882, damages under KRS 365.884, and attorneys' fees under KRS 365.886.

126.    Firewater's, Potter's, Ryelee's, Lilley's, Blessings', Smith's and VanderHyde's actions described herein were conducted intentionally or with oppression, fraud, or malice toward Green Lightning, entitling Green Lightning to punitive damages, the exact amount of which will be determined at trial.

### COUNT VI: FALSE ADVERTISING UNDER THE LANHAM ACT
### (Firewater)

127.    The allegations in the preceding paragraphs are incorporated by reference as if set forth fully herein.

128.    Firewater disseminated to the relevant purchasing public, including Green Lightning's former and current customers, false or misleading statements of fact about Green Lightning's services or commercial activities, and encouraged further dissemination of these statements to others.

129.    This deception is exemplified by Potter's publication of videos on YouTube and other channels that were originally created by Green Lightning to explain the advantages of its nitrogen machines, but were edited to remove or mute every verbal reference to "Green Lightning" and to overlay or substitute a Firewater logo and branding, falsely implying sponsorship, affiliation, or continuity of source. *See* Instagram Videos in Ex. 3, Ex. 4, and Ex. 5.

130.    These false and misleading statements actually deceived, or had a tendency to deceive, a substantial segment of the relevant purchasing public and distributors. The deception was material because it was likely to influence purchasing decisions by suggesting that Firewater's

41

products were the same as, endorsed by, or a continuation of Green Lightning's products and brand, thereby harming the business reputation and goodwill associated with Green Lightning. *See* Ex. 8 (July 9, 2025 marketing email representing that "we have moved global distribution of machines under a new name: Firewater Ag LLC"); Ex. 3, Ex. 4, and Ex. 5 (edited Green Lightning video materials). The deception was material, in that it was likely to influence a customer's purchasing decision, and to damage the business reputation and goodwill associated with the Green Lightning brand with customers.

131.    Green Lightning markets, sells, and supports its products and services in interstate commerce. Firewater disseminated these false and misleading statements in interstate commerce across web and social platforms and via email and social media channels to customers and distribution partners. Firewater's false or misleading statements of fact have proximately caused Green Lightning to have or to likely have suffered damages to its sales, goodwill, and reputation.

132.    Firewater has (i) falsely promoted performance and agronomic results using Green Lightning's trials and data, and (ii) falsely suggested affiliation, sponsorship, or continuity of source through branding and edited content. As set forth above, Firewater republished Green Lightning's trial outcomes under the Firewater brand, despite those results having been generated by Green Lightning machines and protocols before Firewater existed. Those misrepresentations constitute false advertising under 15 U.S.C. § 1125(a)(1)(B) and unfair competition, because they are material, were disseminated in interstate commerce via web, social, and email, and are likely to deceive purchasers regarding Firewater's capabilities and the source of the results.

133.    Separately, as alleged above, Firewater edited Green Lightning videos to mute "Green Lightning," overlaid Firewater branding, and adopted marks and messaging implying that

"global distribution has moved to Firewater Ag, LLC," thereby creating false designation, affiliation, or sponsorship under 15 U.S.C. § 1125(a)(1)(A).

134.    Firewater's challenged statements were disseminated in "commercial advertising or promotion" within the meaning of 15 U.S.C. § 1125(a), including email campaigns sent to multiple current and prospective customers across state lines (such as the "313 Bushels of corn per acre?" email blast from ryelee@firewaterag.com on January 21, 2026, Ex. 23), web pages on firewaterag.com and awesomenitrogen.com accessible nationwide, and posts on social media platforms (including Instagram and other channels) promoting Firewater's machines and agronomic claims.

135.    Firewater's conduct as alleged herein constitutes false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

136.    As a direct and proximate result of Firewater's false and misleading statements of fact, Green Lightning has suffered and unless enjoined will continue to suffer irreparable harm that cannot be fully compensated through monetary damages alone.

137.    As a direct and proximate result of Firewater's false and misleading statements of fact, Green Lightning has suffered, or is likely to suffer, damages to its sales, goodwill, and reputation, including diverted sales opportunities, customer confusion, and impairment of brand value.

## COUNT VII: PATENT INFRINGEMENT
### (Firewater)

138.     The allegations in the preceding paragraphs are incorporated by reference as if set forth fully herein.

139.    Green Lightning is the owner of all rights, title, and interest in the '803 Patent, titled "Apparatus for a Modular Plasma Reactor and Method of Use."

ACTIVE 718223644v7

140.    The '803 Patent is valid and enforceable.

141.    In violation of 35 U.S.C. § 271(a), Firewater makes, uses, offers to sell, and sells its "7-Thunders" plasma systems and thereby directly infringes the '803 Patent. Firewater and the accused "7-Thunders" systems satisfy each and every limitation of one or more claims of the '803 Patent. Firewater thereby directly infringes one or more claims of the '803 Patent.

142.    In violation of 35 U.S.C. § 271(b), Firewater advertises to, sells to, encourages, and instructs third parties, including Firewater's customers and distributors, to use the accused systems. Firewater thereby induces infringement of one or more claims of the '803 Patent by having the specific intent to induce its customers to infringe the '803 Patent, despite knowledge that its customers' acts infringe the '803 Patent.

143.    Firewater's acts of infringement have been and continue to be willful. Firewater has had actual knowledge of the '803 Patent and of its infringement yet has persisted in its infringing activities with reckless disregard of Green Lightning's patent rights.

144.    Green Lightning seeks a finding of willful infringement and an award of enhanced damages under 35 U.S.C. § 284 based on Firewater's egregious, post-notice continuation of infringement. The close mirroring of each limitation of claim 1 and Potter's lack of technical capacity to invent such a system support an inference of deliberate copying and willful infringement.

145.    As a direct and proximate result of Firewater's infringement of the '803 Patent, Green Lightning has suffered and continues to suffer damages in an amount to be determined at trial, including lost profits and/or a reasonable royalty, and has suffered and continues to suffer irreparable harm.

ACTIVE 718223644v7

146.    Unless enjoined, Firewater will continue to infringe the '803 Patent, thereby causing Green Lightning further irreparable harm for which there is no adequate remedy at law.

147.    Green Lightning is entitled to a judgment that Firewater has infringed one or more claims of the '803 Patent, an award of damages adequate to compensate for such infringement, in no event less than a reasonable royalty together with prejudgment and post judgment interest, and to a permanent injunction prohibiting further infringement under 35 U.S.C. § 283.

148.    Because Firewater's infringement has been willful, Green Lightning is further entitled to enhanced damages under 35 U.S.C. § 284, and this case is exceptional warranting an award of Green Lightning's reasonable attorneys' fees and costs under 35 U.S.C. § 285.

## COUNT VIII: TRADEMARK INFRINGEMENT
### (Firewater)

149.    The allegations in the preceding paragraphs are incorporated by reference as if set forth fully herein.

150.    Green Lightning owns a valid registered trademark in its mark.

151.    Green Lightning has priority in use and registration over the confusingly similar Firewater mark and where Green Lightning first used its mark in commerce in connection with a "water treatment apparatus for infusing irrigation water with liquid fertilizer."

152.    In violation of the Lanham Act, including 15 U.S.C. §§ 1114(1) and 1125(a), Firewater's use of confusingly similar marks in commerce on competing goods constitutes trademark infringement and false designation of origin.

153.    Firewater is now using the infringing mark in the United States in connection with liquid fertilizer that is identical, closely related to, overlaps with, and/or is of the same type as Green Lightning's products and services.

ACTIVE 718223644v7

154. Firewater knew about the Green Lightning mark and Green Lightning's products and services before Firewater began to use any of its marks in connection with liquid fertilizer in United States commerce.

155. The Green Lightning mark is arbitrary and presumptively and inherently distinctive when used in connection with liquid fertilizer.

156. The Green Lightning mark has priority over Firewater's confusingly similar mark.

157. Firewater uses the confusingly similar mark in United States commerce in direct competition with Green Lightning.

158. Firewater's use of a mark confusingly similar to the Green Lightning mark, in connection with Firewater's products and services, is likely to cause consumer confusion.

159. The Firewater marks are confusingly similar to the Green Lightning marks in sight and overall impression.

160. Firewater offers products and/or services that are similar and/or highly related to Green Lightning's products and services.

161. Green Lightning and Firewater market their products over similar channels, including over websites and social media accessible throughout the United States.

162. Firewater's actions are likely to mislead the public into believing that Firewater's products and services originate with or are authorized by Green Lightning, which is not the case.

163. Both Green Lightning and the public will be damaged by the public's mistaken conclusion that Firewater's products and services originate with or are authorized by Green Lightning.

164. As an actual and proximate result of Firewater's trademark infringement, Green Lightning has suffered irreparable harm that cannot be fully compensated by monetary damages

46

alone and has suffered damages including loss of income, profits, and goodwill, The irreparable injury will continue if Firewater is not restrained from further violation of Green Lightning's rights.

165.    As an actual and proximate result of Firewater's trademark infringement, Firewater has and will continue to unfairly acquire income, profits, and goodwill.

166.    Green Lightning has no adequate remedy at law.

167.    Pursuant to 15 U.S.C. § 1117, Green Lightning is entitled to recover damages in an amount to be determined at trial and for that amount to be trebled in light of Firewater's willful infringement, profits made by Firewater attributable to its use of its infringing marks, attorneys' fees as a result of Firewater's willful and deliberate misconduct making this an exceptional case, and the costs of this action.

## COUNT IX: BREACH OF CONTRACT
**(Potter, Ryelee, Lilley, Blessings, Smith, VanderHyde, Vaders, and Obeng-Mayaresa)**

168.    The allegations in the preceding paragraphs are incorporated by reference as if set forth fully herein.

169.    As described herein, each of Potter, Ryelee, Lilley, Blessings (through Smith), VanderHyde, Vaders, and Obeng-Mayaresa entered into valid and enforceable written and/or oral agreements with Green Lightning in which he/she/it has agreed, among other things, not to disclose or use Green Lightning's Proprietary Information for any purpose without Green Lightning's express consent.

170.    Green Lightning has fully performed its contractual obligations under each of these agreements.

171.    Green Lightning has never provided Potter, Ryelee, Lilley, Blessings (through Smith), VanderHyde, Vaders, nor Obeng-Mayaresa with consent to disclose or use its Proprietary

47

Information for any purpose unrelated to their employment with Green Lightning and/or that does not benefit Green Lightning.

172.     Potter, Ryelee, Lilley, Blessings (through Smith), VanderHyde, Vaders, and Obeng-Mayaresa have breached their respective agreements with Green Lightning by failing to abide by the confidentiality, non-compete, and/or non-use obligations thereunder. Based on information and belief, Potter, Ryelee, Lilley, Blessings (through Smith), VanderHyde, Vaders, and Obeng-Mayaresa have misappropriated, disclosed, and/or used or threatened to disclose or use Green Lightning's Proprietary Information directly or indirectly for the benefit of Green Lightning's competitor Firewater, and/or for the benefit of Potter, and/or for his/her/its own personal gain.

173.     Further, Potter, Ryelee, Lilley, Blessings (through Smith), VanderHyde, Vaders, and Obeng-Mayaresa have each left their employment with Green Lightning and commenced new employment with Firewater within the last five to seven months. These Defendants' covenants not to compete, not to solicit, and not to disclose Proprietary Information goes beyond seven months. Thus, Potter, Ryelee, Lilley, Blessings (through Smith), VanderHyde, Vaders, and Obeng-Mayaresa are in breach of their covenants not to compete, not to solicit, and not to disclose Proprietary Information.

174.     Green Lightning has suffered and will continue to suffer damages, as a direct and proximate result of each of Potter, Ryelee, Lilley, Blessings (through Smith), VanderHyde, Vaders, and Obeng-Mayaresa's breach of contract in an amount to be decided at trial. In addition, Green Lightning cannot be adequately compensated through monetary relief and requires preliminary injunctive relief in addition to compensatory and punitive damages.

ACTIVE 718223644v7

## COUNT X: BREACH OF CONTRACT (OPERATING AGREEMENT)
### (Potter)

175.    The allegations in the preceding paragraphs are incorporated by reference as if set forth fully herein.

176.    As detailed above, Potter is a party to Green Lightning's Operating Agreement and is in breach of numerous provisions.

177.    Without limitation, Potter breached Section 3.02 of the Operating Agreement by: (i) acting unilaterally as a Manager without seeking joint consent to managerial decisions; and (ii) making payments and capital expenditures in excess of $5,000.00 numerous times.

178.    Without limitation, Potter breached Section 3.03 of the Operating Agreement by: (i) engaging in transactions via Firewater that are in direct contravention to the requirements of the Operating Agreement; (ii) acting in contravention of the Operating Agreement; (iii) engaging in the unauthorized use of Green Lightning's intellectual property; and (iv) making payments and capital expenditures in excess of $5,000.00 numerous times.

179.    The breaches of the Operating Agreement by Potter have caused Green Lightning and each of Plaintiffs to sustain damages in an amount to be proven at trial.

180.    Potter's actions were conducted intentionally or with oppression, fraud, or malice toward the Plaintiffs, entitling the Plaintiffs to punitive damages, the exact amount of which will be determined at trial.

## COUNT XI: TORTIOUS INTERFERENCE WITH CONTRACT
### (Potter and Firewater)

181.    The allegations in the preceding paragraphs are incorporated by reference as if set forth fully herein.

ACTIVE 718223644v7

182.    Potter and Firewater had actual knowledge of the contractual duties, confidentiality obligations, and restrictive covenants that Potter and certain other Green Lightning employees (including each of Ryelee, Lilley, Blessings (through Smith), VanderHyde, Vaders, and Obeng-Mayaresa) owed to Green Lightning and its members.

183.    Despite knowing of these contractual obligations, and without privilege or justification, Potter and Firewater actively assisted, encouraged, and induced Ryelee, Lilley, Blessings (through Smith), VanderHyde, Vaders, and Obeng-Mayaresa to breach their contractual obligations to Green Lightning and its members.

184.    There is no legitimate business or other reason, justification, or privilege supporting or excusing Potter's or Firewater's conduct.

185.    This tortious interference was malicious and done with intent to injure and/or oppress Green Lightning.

186.    Green Lightning was damaged because of this tortious interference and Potter and Firewater should be made to pay compensatory and punitive damages to punish them for this outrageous and intolerable conduct.

### COUNT XII: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIP
### (Potter, Firewater, Ryelee, Lilley, and VanderHyde)

187.    The allegations in the preceding paragraphs are incorporated by reference as if set forth fully herein.

188.    The acts of Potter, Firewater, Ryelee, Lilley, and VanderHyde, as set forth herein, constitute an unlawful interference with Green Lightning's prospective or existing business advantage.

ACTIVE 718223644v7

189.    Potter, Firewater, Ryelee, Lilley, and VanderHyde have intentionally, maliciously, and without privilege or justification, interfered with and continue to interfere with Green Lightning's business relationships and its prospective business relationships.

190.    As a result of Potter's, Firewater's, Ryelee's, Lilley's, and VanderHyde's unlawful activities, Green Lightning has lost or is at risk of losing employees, customer accounts, and revenue and other income which would have been earned therefrom, and has suffered injury to its goodwill and reputation in an amount to be determined at trial.

191.    As a direct and proximate result of Potter's, Firewater's, Ryelee's, Lilley's, and VanderHyde's tortious interference, Green Lightning has suffered loss, damage, and injury in an amount to be proven at trial. The damage and loss to Green Lightning is ongoing and continuing.

192.    The actions of Potter, Firewater, Ryelee, Lilley, and VanderHyde were intentional, malicious, and done with intent to injure and/or oppress Green Lightning, thereby entitling Green Lightning to punitive damages.

193.    Moreover, as a result of Potter's, Firewater's, Ryelee's, Lilley's, and VanderHyde's unlawful activities, Green Lightning has and will continue to suffer immediate and irreparable injury in violation of its rights unless Potter, Firewater, Ryelee, Lilley, and VanderHyde are immediately restrained and permanently enjoined from such activities by Order of this Court. Green Lightning has no adequate remedy at law or otherwise to address this injury.

### COUNT XIII: USURPATION OF CORPORATE OPPORTUNITIES
(Potter)

194.    The allegations in the preceding paragraphs are incorporated by reference as if set forth fully herein.

195.    While acting as an employee of Green Lightning, Potter became and is aware of Green Lightning's current customers and their potential business opportunities.

51

196.    These opportunities were significant and closely related to the existing or prospective activity of Green Lightning.

197.    Green Lightning had the financial ability to pursue these opportunities.

198.    Potter, without justification, failed to advise Green Lightning of these business opportunities and instead usurped these business opportunities that belonged to Green Lightning.

199.    As a direct and proximate result of this wrongful conduct, Green Lightning has suffered damages in an amount to be proven at trial.

## COUNT XIV: UNFAIR COMPETITION
### (All Defendants)

200.    The allegations in the preceding paragraphs are incorporated by reference as if set forth fully herein.

201.    By engaging in the conduct described herein, the Defendants have engaged in unfair competition under the common law of Kentucky.

202.    Such conduct directed to Green Lightning was and is beyond normal and fair competition and lacks common business integrity.

203.    As a direct and proximate result of this wrongful conduct, Green Lightning has suffered damages in an amount to be proven at the time of trial.

204.    As a direct and proximate result of the Defendants' wrongful conduct, Green Lightning is suffering immediate and irreparable injury, harm, and damage, and will continue to suffer injury, harm, and damage, unless the Defendants are enjoined from their unlawful conduct. Green Lightning has no adequate remedy at law.

ACTIVE 718223644v7

## COUNT XV: UNJUST ENRICHMENT
### (Firewater)

205.    The allegations in the preceding paragraphs are incorporated by reference as if set forth fully herein.

206.    Firewater, through the actions of Potter and the other Defendants, encouraged key Green Lightning employees to breach agreements, fiduciary duties, and duties of loyalty, and to solicit Green Lightning customers, solicit Green Lightning employees and engage in other acts of unfair competition.

207.    On information and belief, Potter breached his fiduciary duties to Green Lightning by providing assistance to Firewater while he was still employed as an executive at Green Lightning, including soliciting Green Lightning customers and potential investors for the benefit of Firewater.

208.    In addition, Firewater, through the actions of Potter and other individual Defendants, systematically solicited and/or employed additional covered personnel outside any contemplated list and before the contemplated preconditions were satisfied. Firewater encouraged the former Green Lightning employees to breach their respective duties of loyalty to Green Lightning, and to breach non-compete, non-solicitation, and non-disclosure agreements, and sought to deprive Green Lightning of its highly trained and experienced employees.

209.    The former Green Lightning employees' training, experience, and relationships contain economic value, both actual and potential. Further, the non-compete, non-solicitation, and non-disclosure agreements, along with the legal duties of loyalty and fiduciary duties, derive an economic value to Green Lightning.

210.    Firewater has derived a significant economic value, both actual and potential from Green Lightning to Firewater through, among other things, the solicitation and acquisition of

Green Lightning's employees and the accompanying solicitation and/or encouragement of breaches of employment agreements and breaches of legal duties owed to Green Lightning for its own benefit.

211.    Firewater had appreciable knowledge that it received and retained a significant economic benefit as evidenced through its efforts to solicit the former Green Lightning employees, including but not limited to Potter, Blessings, Smith, Ryelee, Lilley, VanderHyde, Vaders, and Obeng-Mayaresa, through acts of unfair competition and through solicitation and/or encouragement of the breaches of employment agreements and breaches of legal duties as described herein for its own benefit.

212.    Under the circumstances, wherein Firewater acquired and benefited from the acts as described herein, it would be inequitable for Firewater to retain the benefit without payment of the benefit's value to Green Lightning.

213.    Green Lightning is entitled to recover an award of damages for the benefit conferred to Firewater resulting from, as more fully described herein, infringing on Green Lightning's intellectual property rights, acts of unfair competition, for its solicitation and acquiring Green Lightning employees, for the solicitation and/or encouragement of breaches of non-compete, non-solicitation, and non-disclosure agreements by former Green Lightning employees, for its solicitation and/or encouragement of the breaches of the duty of loyalty, the breaches of fiduciary duty, and other actions all of which have conferred and continue to confer an unjust enrichment onto Firewater. The damages include, but are not limited to, Firewater's unjust enrichment and Green Lightning's lost profits.

## COUNT XVI: CIVIL CONSPIRACY
### (All Defendants)

214.    The allegations in the preceding paragraphs are incorporated by reference as if set forth fully herein.

215.    The Defendants worked in concert to accomplish the agreed-upon purpose of tortiously interfering with Green Lightning's contracts and business relations, unfairly competing with Green Lightning, breaching the duties of loyalty owed by Potter and the other individual defendants, among other tortious conduct.

216.    Specifically, and as more fully alleged above, the Defendants—while still employed at Green Lightning—agreed with Firewater to provide aid and information to assist Firewater's competitive product, solicited customers, and transmitted the personal contact information of Green Lightning employees so that Firewater could solicit them in secret.

217.    As a direct and proximate result of the Defendants' conspiracy, Green Lightning has suffered and will continue to suffer damages in an amount to be decided at trial. In addition, Green Lightning cannot be adequately compensated through monetary relief and requires preliminary injunctive relief in addition to compensatory and punitive damages.

## COUNT XVII: FRAUDULENT MISREPRESENTATION
### (Potter)

218.    The allegations in the preceding paragraphs are incorporated by reference as if set forth fully herein.

219.    On or about an investor update call in early 2024 and again on December 16, 2024, Potter represented to Altrus principals that Green Lightning had invoiced over $22M total with expenses only being around $545k for contract labor and $360k for payroll expenses and wages.

In so doing, he represented that the company was in a strong cash position and failed to disclose material refund exposures and liabilities.

220.    These statements were false when made. Green Lightning's own QuickBooks Profit & Loss and Statements of Cash Flows reflect approximately $6.58M in total income for 2024, a net loss of roughly $535,773, and negative operating cash flow. Potter had access to and controlled these records and knew or recklessly disregarded that his statements were false. He also concealed that the company's checking account balance was as low as $143.00 (July 2025) and that substantial refund liabilities existed.

221.    Potter made these statements with the intent to induce Altrus's reliance, including conversion of its debt to equity and continued support. Altrus reasonably and justifiably relied on these statements and, in reliance, converted its convertible note into equity rather than exercising creditors' remedies, continued to fund certain operations, and forwent implementation of stricter financial controls at that time.

222.    As a direct and proximate result of Potter's fraudulent misrepresentations and omissions, Altrus sustained damages, including the diminished value of its equity interests post-conversion, additional capital outlays, lost opportunities, and remediation expenses; the full amount will be proven at trial.

223.    Potter's conduct was intentional, oppressive, fraudulent, and malicious, entitling Altrus to punitive damages. In the alternative, Potter is liable for negligent misrepresentation for supplying false financial information in a business transaction without reasonable care, upon which Altrus justifiably relied to its detriment.

56

## VI.    **PRAYER FOR RELIEF**

WHEREFORE, Green Lightning respectfully requests that this Court enter an order and/or judgment in its favor as follows:

a.    Temporary restraining order, preliminary and permanent injunction ordering Firewater and its officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them, explicitly including Potter, Awesome, Firewater UK, Blessings, Ryelee, Lilley, VanderHyde, Vaders, Obeng-Mayaresa, and Smith,

    a.    To cease using or disclosing any of Green Lightning's Proprietary Information, including its trade secrets;

    b.    To return to Green Lightning any of its Proprietary Information in Firewater's possession or control;

    c.    To cease using the following trademark (or similar marks):



    a.    To cease all forms of false or deceptive advertising which includes: (i) informing customers, prospective customers, vendors, brand ambassadors, or other stakeholders that Green Lightning is "going out of business"; and (ii) either directly or indirectly using Green Lightning's Proprietary Information, which includes using Green Lightning's marketing videos and test results, to misrepresent origin, sponsorship, and affiliation;

    b.    To cease any currently pending sale or offer of sale of any technology that converts water into nitrogen for agricultural purposes;

c. To cease making, using, offering to sell, and selling any system, subassembly, or component that infringes one or more claims of the '803 Patent;

d. To remove from commerce and escrow all "7-Thunders" systems and non-staple components, and provide a verified accounting of all such items made, used, sold, offered for sale, or imported; and

e. To cease inducing and contributing to infringement by advertising, instructing, assisting, or supplying infringing systems or specially adapted components, and retract/correct materials that encourage infringing use.

b. Temporary restraining order, preliminary and permanent injunction ordering Potter, Awesome, Firewater UK, Ryelee, Lilley, VanderHyde, Vaders, Smith, Blessings, Obeng-Mayaresa, and any other persons who are in active concert or participation with them,

a. To comply with post-employment restrictive covenants;

b. To refrain from competing for their respective, contractual period;

c. To refrain from soliciting Green Lightning customers, prospects, distributors, suppliers, or employees for their respective contractual period;

d. To maintain confidentiality and return all Green Lightning materials/data; and

e. To provide sworn certifications of compliance, identifying any communications, solicitations, or competitive activities since separation.

c. A temporary restraining order and preliminary injunction ordering each Defendant, their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them,

a. To cease using or disclosing any of Green Lightning's Proprietary Information;

    b.   To return to Green Lightning any of its Proprietary Information in each Defendant's possession or control;

    c.   To cease any currently pending sale or offer of sale of any technology that converts water into nitrogen for agricultural purposes; and

    d.   To cease violating the provisions of Potter's, Blessings', Ryelee's, Lilley's, VanderHyde's, Vaders', Obeng-Mayaresa's, and Smith's respective employment agreements, including but not limited to, any non-competition and/or non-solicitation agreements.

d.   An order finding that Green Lightning has been damaged by the Defendants' conduct and an award of damages on each claim set forth in the Complaint against each of the Defendants identified therein, in an amount to be determined at trial but in no event less than Green Lightning's lost profits.

e.   An order finding that Firewater has been unjustly enriched by its conduct and that Firewater is liable to Green Lightning for a disgorgement of profits in an amount to be determined at trial but in no event less than restitution of any revenues or other benefit obtained by Firewater as a result of its conduct.

f.   An order awarding punitive damages on account of the Defendants' willful misappropriation of trade secrets, malicious conversion of Green Lightning's Proprietary Information, and intentional interference with contracts and prospective economic relations, to the extent such claims are set forth against each of the respective Defendants and in an amount to be determined at trial.

ACTIVE 718223644v7

g.  An order awarding double damages for the harm caused to Green Lightning by Potter's, Ryelee's, Lilley's, Blessing's, Smith's, and VanderHyde's willful misappropriation of Green Lightning's trade secrets.

h.   To return and deliver to Green Lightning all original and derivative video assets and related materials, including raw footage, for any Green Lightning-origin content, and to remove and cease any further use, hosting, or display of such content under Firewater-controlled websites, social media, or other channels.

i.  A trial by jury on all issues so triable.

j.  An order awarding Green Lightning, as the prevailing party, reasonable attorneys' fees as deemed appropriate by the Court.

k.  An award of costs to Green Lightning, as the prevailing party, as deemed appropriate by the Court.

l.  Pre-judgment and post-judgment interest at the maximum rate provided by law.

m.  Such other and further relief as this Court may deem appropriate under the circumstances.

n.  All such other and further relief, at law or in equity, to which Green Lightning may be justly entitled.

*[Signature Page Follow*

60

DATED: February 13, 2026

Respectfully submitted,

/s/ Grahmn N. Morgan
Grahmn N. Morgan
Drake W. Staples
DINSMORE & SHOHL LLP
100 West Main Street, Suite 900
Lexington, KY 40507
Telephone: 859-425-1010
Facsimile: 859-425-1099
grahmn.morgan@dinsmore.com
drake.staples@dinsmore.com

Marc T. Rasich (*pro hac vice forthcoming*)
Carson Heninger (*pro hac vice forthcoming*)
GREENBERG TRAURIG, LLP
222 S. Main Street, Suite 1730
Salt Lake City, UT 84101
Telephone: 801-478-6914
marc.rasich@gtlaw.com
carson.heninger@gtlaw.com

*Counsel for Plaintiffs*

## <u>VERIFICATION</u>

I, Joseph E. Lewis III, as a Member and Manager of Green Lightning Solutions, LLC, and on its behalf, verify that I have reviewed the foregoing Complaint and that the factual allegations are true and correct to the best of my personal knowledge and belief. The facts alleged on information and belief I also believe to be true based on investigation and information received to date.

DATED: February 13, 2026

Joseph E. Lewis III, Member and Manager