UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| ALTRUS CAPITAL – ECO, LP, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Civil Action No. 5:26-CV-049-CHB |
| | ) | |
| v. | ) | |
| | ) | |
| FIREWATER AG, LLC, et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |
| | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on the Amended Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Discovery, [R. 11], filed by Plaintiffs Altrus Capital – Eco, LP, Altrus Capital – Green Lightning, LP, Joseph E. Lewis, III, and Green Lightning Solutions, LLC. Defendants Firewater AG, LLC, Travis Potter, Ryelee Potter, and Ben Smith filed a response addressing Plaintiffs' request for a temporary restraining order, [R. 23], and Plaintiffs replied. [R. 29]. On March 6, 2026, the Court heard oral argument on Plaintiffs' request for a temporary restraining order. *See* [R. 34]. That request is therefore ripe for review. For the reasons set forth below, the Court will issue a temporary restraining order.

## I.    BACKGROUND

Plaintiff Green Lightning Solutions, LLC ("Green Lightning") was formed in April 2024 by Plaintiff Joseph E. Lewis and Defendant Travis Potter to develop and commercialize plasma fertilizer technologies. [R. 1, ¶¶ 2, 37]. Plaintiff now alleges that Travis Potter, while serving as a manager, member, and Chief Executive Officer ("CEO") of Green Lightning, founded Defendant Firewater AG, LLC ("Firewater"), a competing venture. *See, e.g.*, *id.* ¶¶ 51, 67. Relevant here,

1

Plaintiffs allege that this violates Travis Potter's fiduciary duties, and Travis Potter, Firewater, and the other named defendants have misappropriated Green Lightning's trade secrets, engaged in patent infringement, trademark infringement, unfair competition, and false advertising, and breached their employment agreements with Green Lightning. *See generally* [R. 1].

On February 13, 2026, Plaintiffs filed their complaint in this action, asserting the following causes of action: breach of fiduciary duties (Count I against Travis Potter only); aiding and abetting breach of fiduciary duties (Count II, against Firewater, Firewater UK, Awesome Nitrogen Pvt. Ltd., Ryelee Potter, Lilley, VanderHyde, Vaders, Obeng-Mayaresa, Blessing Abundantly LLC, and Smith); conversion/misappropriation of funds and/or property (Count III, against Travis Potter, Firewater, Ryelee Potter, Lilley, and VanderHyde); violations of the federal Defend Trade Secrets Act (Count IV, against Firewater, Travis Potter, Ryelee Potter, Lilley, Blessings Abundantly LLC, Smith, and VanderHyde); violations of the Kentucky Uniform Trade Secrets Act (Count V, against Firewater, Travis Potter, Ryelee Potter, Lilley, Blessings Abundantly LLC, Smith, and VanderHyde); false advertising under the Lanham Act (Count VI, against Firewater only); patent infringement (against Firewater only); trademark infringement under the Lanham Act (Count VIII, against Firewater only); breach of contract (Count IX, against Travis Potter, Ryelee Potter, Lilley, Blessings Abundantly LLC, Smith, VanderHyde, Vaders, and Obeng-Mayaresa); breach of the Operating Agreement (Count X, against Travis Potter only); tortious interference with contract (Count XI, against Travis Potter and Firewater); tortious interference with business relationship (Count XII, against Travis Potter, Firewater, Ryelee Potter, Lilley, and VanderHyde); usurpation of corporate opportunities (Count XIII, against Travis Potter only); unfair competition under Kentucky common law (Count XIV, against all Defendants); unjust enrichment (Count XV, against Firewater only); civil conspiracy (Count XVI, against all Defendants); and fraudulent

misrepresentation (Count XVII, against Travis Potter only).

That same day, Plaintiffs filed a Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Discovery, [R. 3]. The Court conducted a telephonic status conference, at which time counsel for Plaintiffs and Defendants Firewater, Travis Potter, Ryelee Potter, and Smith appeared. [R. 10]. At Defendants' request, the plaintiffs were given an opportunity to file an amended motion that included citations to the complaint and its exhibits. *Id.* Lastly, the Court entered an expedited briefing schedule and set a hearing on the Plaintiffs' request for a temporary restraining order. *Id.*

Plaintiffs amended motion was filed on February 19, 2026. [R. 11]; [R. 12]. By agreement of the parties, the Court amended the briefing schedule. [R. 15]; [R. 18]; [R. 19]. On February 26, 2026, Defendants filed their response to Plaintiff's request for a temporary restraining order. [R. 23]. Plaintiffs filed a reply on March 3, 2026. [R. 29]. Court heard oral argument on March 6, 2026, and took the matter under advisement. [R. 34]. For the reasons set forth below, the Court will grant, in part, Plaintiff's request for a temporary restraining order.

## II.    ANALYSIS

Under Federal Rule of Civil Procedure 65, a court may grant a temporary restraining order without written or oral notice to the adverse party if certain conditions are satisfied. That rule provides that "[t]he court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if" the following has been shown:

> (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and
> (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

Fed. R. Civ. P. 65(b)(1). Notice under this rule must be "reasonable," meaning it "consists of information received within a reasonable time to permit an opportunity to be heard." *Dealer Trade Network Holdco, LLC v. Lynch*, No. 3:23-cv-411-RGJ, 2023 WL 7181289, at *1 (W.D. Ky. Sep. 6, 2023) (quoting *Abrahamson v. Jones*, No. 1:16-CV-712, 2016 WL 3855204, at *4 (S.D. Ohio July 15, 2016)); *see also Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Driver Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 439 (1974)).

In the present case, there is no dispute that Defendants Firewater, Travis Potter, Ryelee Potter, and Smith have received notice of Plaintiffs' request for a temporary restraining order, as those defendants have appeared (by counsel), participated in a telephonic status conference, filed a response to Plaintiffs' motion, and participated in oral argument, among other things. Nevertheless, counsel for these defendants relies repeatedly on the Rule 65(b)(1)'s requirements for issuing a temporary restraining order *without* notice. *See, e.g.*, [R. 23, pp. 1, 2, 8, 9, 21–22]. When questioned about this at the March 6, 2026 hearing, counsel insisted that the remaining defendants, who have not yet appeared in this case, were not represented by him and have not received notice, such that Plaintiffs must still comply with Rule 65(b)(1)'s requirements, despite another defense counsel previously attesting to the Court that they represented *all* Defendants. *See* Tr., pp. 5–6;[1] [R. 23-5, ¶ 2]. However, it is clear from the record that these unrepresented defendants received actual notice of this action and Plaintiffs' request for a temporary restraining order. For instance, Plaintiffs emailed copies of the pending motion and related filings to all remaining defendants. [R. 7]; [R. 21]; [R. 30]. And counsel was ordered to provide additional notice, which they did. [R. 35]. Such efforts have been deemed sufficient to provide notice under

---

[1] The Court has obtained and cited to an unofficial copy of the transcript of the March 6, 2026 hearing.

Rule 65(b)(1).[2] *See Abrahamson v. Jones*, No. 1:16-cv-712, 2016 WL 3855204, at *4 n.15 (S.D. Ohio July 15, 2016).

Having resolved defense counsel's notice concerns, the Court turns to Plaintiffs' request for a temporary restraining order. The Sixth Circuit has described a temporary restraining order as "an extraordinary remedy designed for the limited purpose of preserving the status quo pending further proceedings on the merits." *Stein v. Thomas*, 672 F. App'x 565, 572 (6th Cir. 2016). In determining whether to grant such relief,

> the Court considers the same four factors applicable to a motion for preliminary injunction: (1) the movant's likelihood of success on the merits; (2) whether the movant "would likely be permanently harmed absent the injunction; (3) whether the injunction would cause substantial harm to third parties; and (4) whether the injunction would serve the public interest."

*Dinter v. Miremami*, 627 F. Supp. 3d 726, 730 (E.D. Ky. 2022) (quoting *McGirr v. Rehme*, 891 F.3d 603, 610 (6th Cir. 2018)). However, while the standard for a temporary restraining order is the same as that for a preliminary injunction, "there is an increased emphasis on irreparable harm." *Id.* (citations omitted); *see also Ecolab, Inc. v. Shanklin*, No. 3:23-CV-215-CHB, 2023 WL 4365933, at *2 ("Importantly, while this inquiry requires the Court to balance multiple factors, 'the existence of an irreparable injury is mandatory.'" (quoting *Ohio v. Becerra*, No. 21-4235, 2022 WL 413680, at *2 (6th Cir. Feb. 8, 2022))). With these general principles in mind, the Court turns to the parties' arguments and the four factors required for a temporary restraining order, beginning with the likelihood of success on the merits.

### A. Likelihood of Success on the Merits

To demonstrate a "likelihood of success on the merits," a movant must simply show that it

---

[2] Moreover, the Court finds specific facts "clearly show[ing] that immediate and irreparable injury, loss, or damage will result to the" plaintiffs. Fed. R. Civ. P. 65(b)(1)(A); *infra* Section II(B) (discussing specific facts supporting irreparable harm).

has a "reasonable probability that it will prevail on the merits." *Dinter*, 627 F. Supp. 3d at 730 (quoting *Trefelner ex rel. Trefelner v. Burrell Sch. Dist.*, 655 F. Supp. 2d 581, 589 (W.D. Pa. 2009)). In their motion, Plaintiffs argue that they are likely to succeed on the merits of their claims against Travis Potter for violation of his fiduciary duties; against Firewater, Travis Potter, Ryelee Potter, Lilley, Blessings Abundantly LLC, Smith and VanderHyde for misappropriation of Green Lightning's trade secrets; against Firewater for infringing on Green Lightning's patented technology; against Firewater for violating the Lanham Act by misappropriating Green Lightning's trademarks and engaging in false advertising practices; and against Travis Potter, Ryelee Potter, Lilley, Blessings Abundantly LLC (through Smith), VanderHyde, Vaders, and Obeng-Mayaresa for breach of their employment agreements. [R. 11, p. 4]. The Court addresses each of these claims in turn.

### 1. Breach of Fiduciary Duties

#### a. Arbitration Arguments

In Count I of their complaint, Plaintiffs assert a breach of fiduciary duty claim against Travis Potter. [R. 1, ¶¶ 90–95]. Defendants argue that this claim must be submitted to arbitration. [R. 23, p. 3]. Thus, before considering Plaintiffs' likelihood of success on the merits of this claim, the Court considers Defendants' arbitration arguments.

As an initial matter, the Court finds it difficult to pin down Defendants' precise argument on this issue. In their response brief, Defendants fail to address the merits of the breach of fiduciary claim and instead note that, under Kentucky law, the duties of loyalty and care can be altered by an operating agreement. [R. 23, p. 3]. As a result, they argue, the question of whether Travis Potter owed and breached a duty requires interpretation of the company's Operating Agreement. *Id.* But, they continue, the Operating Agreement contains a mandatory alternative dispute resolution

6

("ADR") provision (Section 11.02) stating that "[a]ny dispute regarding the enforcement or interpretation of this Operating Agreement or otherwise arising from or through this Operating Agreement shall be resolved through alternative dispute resolution." *Id.*; *see also* [R. 1-1, p. 22, § 11.02].[3]

However, as Plaintiffs point out in their reply, Section 11.05 of the Operating Agreement expressly provides:

> In the event of any actual or prospective breach or default by any party, the other parties shall be entitled to equitable relief, including remedies in the nature of injunction and specific performance, awarded by a court of competent jurisdiction (without being required to post a bond or other security or to establish any actual damages).

[R. 1-1, p. 23, § 11.05]. When pressed on this provision, defense counsel argued that, in Kentucky, a fiduciary duty does not arise solely by virtue of one's status as a member in a limited liability company. The Court understands that defense counsel was referring to Kentucky Revised Statute ("KRS") § 275.170(4), which provides that "[a] member of a limited liability company in which management is vested in managers under KRS 275.165(2) and who is not a manager shall have no duties to the limited liability company or the other members solely by reason of acting in his or her capacity as a member." From this, defense counsel argued, whatever duties Travis Potter owed, he owed by virtue of his position as a *manager* not a *member*.[4] And, defense counsel continued, his duties as a manager are "bound up" in the Operating Agreement itself.

However, when pressed on what provisions in the Operating Agreement provide Travis Potter, as manager, with the authority to perform the actions that now form the basis of Plaintiffs'

---

[3] At the hearing, defense counsel cited *SmithGroup, Inc. v. Pure Architecture and Development, PLLC*, No. 1:24-cv-249, 2024 WL 3179176 (W.D. Mich. May 9, 2024) for support, claiming that it was "remarkably on point." Tr., pp. 13–14. Unlike the present case, however, the agreement in that case did not have an express carve out provision for injunctive relief.

[4] The Court notes that, per the complaint, Travis Potter was also Chief Executive Officer of Green Lightning.

breach of fiduciary duty claims, defense counsel pivoted, surprisingly, and stated that the Court need not look to the Operating Agreement because the Court can look to the statute. *See* Tr., p. 34. The Court understands that defense counsel was referring to KRS § 275.170(1), which provides that the duty of loyalty "shall be to account to the limited liability company and hold as trustee for it any profit or benefit received [from certain transactions] by that person without the consent of more than one-half (1/2) by number of the disinterested managers, or a majority-in-interest of the members from." Thus, from the best the Court can tell, defense counsel argued that managers of a limited liability company can agree that a manager is permitted to undertake certain actions that might otherwise violate a fiduciary duty, and they did so in this case.

As to what specific agreement existed in this case, defense counsel first pointed to certain negotiations undertaken in late August or early September 2025 by Lewis, Travis Potter, and other Green Lightning investors. *See, e.g.*, [R. 23-1, ¶¶ 5–7 (Travis Potter Affidavit)]. During those negotiations, these individuals "discussed a potential separation framework under which certain, limited personnel would transition to a contemplated 'NuCo' focused on non-U.S. sales of Green Lightning technology while Green Lightning retained a defined core team." [R. 1, ¶ 72]; *see also* [R. 29-2, ¶ 3 (Lewis Affidavit)]. While a formal agreement was never finalized, *see, e.g.*, [R. 29-2 (Harp Letter, Exh. A to Lewis Affidavit)], it is clear from the record that Travis Potter planned to operate a new company focused on international distribution, while remaining associated with Green Lighting as the "core team." [R. 1, ¶ 72]; *see also* [R. 23-1, ¶¶ 5 (Travis Potter Affidavit, stating that Firewater was the vehicle through which the "separated operations would be conducted" and its purpose "was to serve as the operational successor for the transitioning business functions")]. The parties agree that they also discussed whether certain Green Lightning employees would transfer to this new company. Thus, from the best the Court can tell, Defendants argue that

Travis Potter did not breach any fiduciary duties by forming and operating Firewater and using Firewater's technology, marketing materials, crop testing trials, and employees, because he and Lewis had reached an "agreement" allowing him to do so.

The record is clear, however, that no agreement was ever finalized. *See* [R. 29-2, ¶¶ 6 (Lewis Affidavit)]; [R. 29-2 (Harp Letter, Exh. A to Lewis Affidavit)]; [R. 29–3, ¶¶ 5–9 (Massick Affidavit)]; [R. 29-3, p. 7 (Exh. A to Massick Affidavit, stating "Term Sheet – Discussion" is "Not Legally Binding")]. Indeed, in a January 9, 2026[5] letter from defense counsel to Plaintiffs' counsel, defense counsel cited to the parties' term sheet and insisted that it was non-binding. *See* [R. 29-2 (Exh. A to Lewis Affidavit)]. And at the hearing, defense counsel, when pressed, admitted that "[t]hey did not reach a final agreement." Tr., p. 34. Moreover, it is unclear how such an agreement, even if enforceable, would trigger the arbitration provisions of the Operating Agreement.

Regardless, defense counsel later pointed to Section 3.06 of the Operating Agreement, arguing—again, from the best the Court can tell—that this provision authorizes certain self-dealing transactions and, as a result, resolution of the fiduciary duty claim necessarily requires interpretation of the Operating Agreement. But Section 3.06 provides only that

> [t]he Manager shall devote such part of their time to the Company as may be required to manage and supervise the Company business and affairs. Any transaction between the Company and the Manager or Member, or between the Company and any Affiliate of any Member or the Manager, is hereby expressly authorized, provided that the terms of such transaction are generally no less favorable to the Company than the terms that would be made available to the Company in an arm's length transaction.

[R. 1-1, p. 10, § 3.06].[6] Thus, this provision only authorizes certain transactions between the company, Green Lightning, and a manager or member, or an affiliate of a manager or member. No such transactions are at issue in this case. As already explained, while the parties may have engaged

---

[5] While the letter is dated January 9, 2025, the Court understands that the correct date is January 9, 2026.
[6] The Court refers to the page number listed at the bottom of each page of the Operating Agreement.

in negotiations for a transaction between Green Lightning and Travis Potter (and his affiliate, Firewater), the record is clear that no agreement was ever reached.

In sum, while the parties may have been permitted by law to contract around their fiduciary duties, defense counsel has failed to point to any provision in the Operating Agreement that does so, or that requires interpretation, such that the Operating Agreement's arbitration provisions might be triggered. Instead, the equitable relief sought by Plaintiffs is expressly authorized by Section 11.05 of the Operating Agreement. *See* [R. 1-1, p. 23, § 11.05 ("In the event of any actual or prospective breach or default by any party, the other parties shall be entitled to equitable relief, including remedies in the nature of injunction and specific performance, awarded by a court of competent jurisdiction. . . .")].

Having resolved the threshold arbitration arguments, the Court will consider whether Plaintiffs are likely to succeed on their breach of fiduciary duty claim against Travis Potter.

### b.  Likelihood of Success on the Merits

To succeed on the breach of fiduciary duty claim, a plaintiff must show that "'(1) the defendant owes a fiduciary duty to the plaintiff; (2) the defendant breached that duty; and (3) the plaintiff suffered damages as a result of the breach.'" *GenCanna Acquisition Corp. v. 101 Enterprises, LLC*, No. 5:23-cv-00305-GFVT, 2024 WL 4333679, at *3 (E.D. Ky. Sep. 25, 2024) (quoting *Insight Kentucky Partners II, L.P. v. Preferred Auto. Servs., Inc.*, 514 S.W.3d 537, 546 (Ky. Ct. App. 2016)).

As to the first element, the plaintiffs allege in their complaint that Travis Potter, as a member, manager, and CEO of Green Lightning, owed fiduciary duties of care and loyalty to Green Lightning "under KRS 275.170 and other applicable laws, including Kentucky common law." [R. 1, ¶ 91]. The statutory provision, KRS § 275.170, governs limited liability companies

and imposes statutory duties of care and loyalty. For example, with respect to a breach of the duty of care, the statute explains that a member or manager may be liable for actions taken, or the failure to act, on behalf of the limited liability company, if those acts or omissions constitute wanton or reckless misconduct. *See* KRS § 275.170(1). As for the duty of loyalty, the statute provides that

> a member or manager must account to and hold as a trustee for a limited liability company any profit or benefit derived from the use of company property by that member or manager including, but not limited to, confidential, proprietary, or other matters entrusted to that person's status as manager or member,

unless otherwise provided in a written operating agreement. *Patmon v. Hobbs*, 280 S.W.3d 589, 595 (Ky. Ct. App. 2009).

These statutory obligations are "supplemented by a common law duty." *GenCanna*, 2024 WL 4333679, at *3. However, courts have explained that, to the extent the statute and the common law conflict, the common law is displaced. *Brunswick TKTKonnect, LLC v. Kavanaugh*, 661 F. Supp. 3d 698, 708 (W.D. Ky. 2023) (quoting *Pannell v. Shannon*, 425 S.W.3d 58 (Ky. 2014)). Nevertheless, "it appears that Kentucky courts have determined that a manager of a manager-managed LLC [like Green Lightening] owes *both* a common law fiduciary duty of loyalty and a statutory duty of loyalty (KRS § 275.170), and those common law fiduciary duties of loyalty do not conflict with KRS § 275.170." *Id.* at 709 (emphasis added).[7]

Defendants do not dispute that, in the absence of an agreement otherwise, Travis Potter, as a manager and CEO, owed these duties to Green Lightning. And as already explained, Defendants have failed to cite to any such agreement negating his duties. The Court therefore finds that Travis

---

[7] In *Brunswick*, the district court explained that there is a common law duty of loyalty owed to *members* of a limited liability company, in addition to the statutory duties imposed by KRS § 275.170. *See Brunswick*, 661 F. Supp. 3d at 708. The Court understands from Plaintiffs' complaint that they argue only that Travis Potter owed fiduciary duties to Green Lightning. *See* [R. 1, ¶ 91]. Regardless, under the common law, Travis Potter, as manager of the limited liability company, also owed fiduciary duties to its members. *See Brunswick*, 661 F. Supp. 3d at 708.

Potter owed fiduciary duties of loyalty and care to Green Lightning, under both KRS § 275.170 and Kentucky common law.

As to whether Travis Potter breached those duties, Plaintiffs argue that he did so by creating a company, Firewater, that competes in the same market; using Green Lightning's technology to create a competing product, the 7 Thunders machine (regardless of whether that use also constitutes patent infringement or misappropriation of trade secrets); copying Green Lightning's crop testing trials in its marketing and claiming the results were based on Firewater's technology; copying Green Lightning's advertising videos with Firewater's own logo superimposed over any mention of Green Lightning; and poaching Green Lightning customers. *See, e.g.*, [R. 11, pp. 4–6 (citing R. 1, ¶¶ 4–7, 11–12, 51–55, 58–65, 66–70, 79–83)]; [R. 1-3]; [R. 1-4]; [R. 1-5]; [R. 1-23]. Plaintiffs also argue that Travis Potter "commingled his finances with Green Lightning and engaged in unauthorized expenditures and governance violations," including unapproved personal expenditures. [R. 11, p. 5].

For their part, at oral argument, Defendants argued that Travis Potter was permitted to undertake these actions by "agreement," specifically the parties' negotiations in August/September 2025, even though no "final agreement" was reached. The Court has already disposed of this argument, as no agreement was ever finalized. *See supra* Section II(A)(1)(a); *see also* [R. 29-2, ¶¶ 6 (Lewis Affidavit)]; [R. 29-2 (Exh. A to Lewis Affidavit)]; [R. 29–3, ¶¶ 5–9 (Massick Affidavit)]; [R. 29-3, p. 7 (Exh. A to Massick Affidavit, stating "Term Sheet – Discussion" is "Not Legally Binding")]; Tr., p. 34 (agreeing that no final agreement was ever reached). And to the extent Defendants pivoted from this argument at the March 6, 2026 hearing and instead argued that the doctrines of waiver, promissory estoppel, or detrimental reliance apply, the Court notes

12

that Defendants failed to raise this argument in their briefing, and, at oral argument, they failed to develop this argument or cite to any law or persuasive evidence in support.

Importantly, beyond these arguments, the defendants do not dispute that Travis Potter, through his actions and through his company, Firewater, took the actions outlined above, or contest that such actions would otherwise constitute breaches of Travis Potter's fiduciary duties. Indeed, at the March 6, 2026 hearing, defense counsel represented that Defendants would agree to stop using Green Lightning's crop testing trial results, and they have allegedly already taken down Green Lightning's marketing videos that they copied and used for Firewater. While the Court commends Defendants for doing so and certainly encourages the parties to work towards these types of agreements, the Court also takes this, understandably, as a tacit admission, given how obvious it is on the record that Defendants used the trial results and videos in their own marketing channels. Defense counsel also acknowledged that Travis Potter had hired Green Lightning employees, and it is clear that Firewater is competing against Green Lightning.

Likewise, on the current record, it is apparent that Travis Potter used Green Lightning technology to develop and produce Firewater's products. To the extent Defendants argued that this technology is also publicly available (by virtue of Green Lightning's products being sold to members of the public), they did so in the context of Plaintiff's trade secret misappropriation claims. *See* Tr., pp. 50–51 (" . . . Green Lightning's products [are] publicly available which negates trade secret status."). Moreover, even if Green Lightning products are available in a public market, it is clear that Travis Potter used his own knowledge of Green Lightning technology, internal testing, and product development to design and launch the 7 Thunders machine, Firewater's competing product. Green Lightning expends significant resources to fund the testing trials to establish the efficacy of its proprietary system. *See* [R. 1, ¶¶ 79–83]; [R. 11, p. 14]; [R. 18-2, ¶¶ 14–

13

15]. As already noted, Firewater copied Green Lightning's crop testing trials, developed by Green Lightning to promote Green Lightning's technology, and instead marketed the results as being generated by Firewater's own products. *See, e.g.*, [R. 1-3]; [R. 1-4]; [R. 1-5]; [R. 1-23]. Defendants do not dispute this. In copying these materials, Firewater claims that those trial results and other data resulted from Firewater technology. This is tantamount to conceding that the technologies are the same.

The law is clear that such actions, including the use of the same or similar technology as Green Lighting through the 7 Thunders machine (even in the absence of infringement) constitute breaches of a limited liability company manager's fiduciary duties. *See generally* KRS § 275.170. For example, a manager of a limited liability company breaches his fiduciary duties by exploiting his position to appropriate a business opportunity that rightfully belongs to the limited liability company, without disclosure of the conflict of interest and consent. *See Patmon v. Hobbs*, 280 S.W.3d 589, 593–596 (Ky. Ct. App. 2009) (forming a competing business and diverting certain lease projects to that new business constituted breach of fiduciary duties); *Mounts v. Mounts & Dannheiser, LLC*, No. 2022-CA-0883-MR, 2025 WL 5809680, at *3–5 (Ky. Ct. App. Sep. 8, 2023) (writing checks from company account, without consent or disclosure, to both himself and to another company owned by him, violated the defendant's fiduciary duties); *McNees v. RC Nassar, LLC*, 2018-CA-001711-MR, 2020 WL 1074795, at *4–5 (Ky. Ct. App. Mar. 6, 2000) (finding certain self-dealing transactions to be a breach of fiduciary duty under KRS § 275.170).

Lastly, the Court finds there is a reasonable probability that Plaintiffs can prove they suffered damages as a result of these alleged breaches. *See, e.g.*, [R. 1, ¶¶ 15 (referencing diversion of customers and revenue, impairment of goodwill, and degradation of its competitive position in a nascent market), 84–89 (citing to customer confusion, loss of sales, loss of goodwill, loss of

status as exclusive seller of its technology, and the upcoming "spring planting season")]. Defendants do not dispute this element of Plaintiffs' breach of fiduciary duties claim, but rather argue any damages may be resolved through money damages rather than injunctive relief. And as discussed in more detail below, the evidence of record demonstrates an actual loss of customers, *see* [R. 29-1 (Lyne Affidavit)], and other irreparable harms. *See infra* Section II(B).

Given the evidence of record, the Court finds that Plaintiffs are likely to succeed on the breach of fiduciary duty claim against Travis Potter.

### 2. Misappropriation of Trade Secrets

Plaintiffs also bring a claim under the federal Defend Trade Secrets Act (Count IV, against Defendants Firewater, Travis Potter, Ryelee Potter, Lilley, Blessings Abundantly, LLC, Smith, and VanderHyde), and violation of the Kentucky Uniform Trade Secrets Act (Count V, against the same defendants). [R. 1, ¶¶ 106–126]. In their motion, Plaintiffs allege that Defendants Lilley and VanderHyde (both former employees of Green Lightning), "seemingly at the direction of [Travis] Potter and Firewater," exported Green Lightning's "Customer Relationship Management datasets," or CRM datasets, shortly before departing Green Lightning. [R. 11, p. 7]. This data included "thousands of invaluable records that Green Lightning has acquired through substantial time, effort, and resources," and which it sought to protect by having employees sign non-disclosure, non-compete, and non-solicitation provisions." *Id.* The exporting of this data was followed by Firewater's "rapid market rollout leveraging Green Lightning's relationships and materials." *Id.* at 8.

At the March 6, 2026 hearing, the Court asked Plaintiffs to identify the specific trade secrets at issue. Plaintiffs' counsel explained that the trade secrets at issue in Counts IV and V of the complaint include their technology (i.e., the machine itself) and the CRM datasets. *See* Tr.,

p. 45. However, after some discussion, Plaintiffs' counsel clarified that, for purposes of their request for a temporary restraining order, Plaintiffs relied only on the allegations surrounding the alleged misappropriation of the CRM datasets. *Id.* at 77. On this point, defense counsel insists that the employees alleged to have misappropriated that data, namely, Lilley and VanderHyde, are not employed by Firewater and never provided Firewater with any such datasets. *See, e.g.*, [R. 23-1, ¶¶ 15–16 (Travis Potter Affidavit)]. In response, Plaintiffs' counsel indicated that if Lilley and VanderHyde provided sworn statements that they have not and will not disclose or share the CRM datasets with anyone, and that they have deleted any such information from their devices and no longer possess such information, that may be sufficient to quell Plaintiffs' concerns. *See* Tr., pp. 77–78. However, without any such sworn declarations in the record (and those defendants having not yet appeared before the Court), Plaintiffs continue to pursue a temporary restraining order based on the alleged misappropriation of the CRM datasets. *Id.* at 78. Having clarified this point, the Court considers whether Plaintiffs have demonstrated a likelihood of success on this claim.

To succeed on a claim for misappropriation of trade secrets under the federal statute, the plaintiffs must establish

> an unconsented disclosure or use of a trade secret by one who used improper means to acquire the secret; or, at the time of the disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret.

*C-Ville Fabricating, Inc. v. Tarter*, 5:18-CV-379-KKC, 2019 WL 1368621, at *12 (E.D. Ky. Mar. 26, 2019) (quoting *Ford Motor Co. v. Launch Tech. Co.*, No. 17-12906, 2018 WL 1089276, at *16 (E.D. Mich. Feb. 26, 2018)) (internal quotation marks omitted).

"Kentucky's trade secret protection statute is nearly identical to the" federal Defend Trade Secrets Act. *Id.* at *14. To establish a violation of the Kentucky statute, a plaintiff must show "(1)

16

the existence of a trade secret, and (2) the misappropriation of that trade secret." *Id.* (citation omitted). As to the first element, and similar to federal law, a trade secret under Kentucky law "requires that the information at issue (1) have independent economic value, (2) not be generally known or readily ascertainable by proper means, and (3) be the subject of reasonable efforts to maintain its secrecy." *Id.* (citation omitted). And, like the federal statute, "to establish an act of misappropriation [under the Kentucky statute], the plaintiff must show that the information at issue was used without proper consent, disclosed improperly, or acquired through improper means." *Id.* (citation omitted).

As to whether the CRM datasets constitute trade secrets, Defendants do not appear to dispute that the datasets have independent economic value or would not generally be known or readily ascertainable by proper means. *See generally* [R. 23 (Response)]; *C-Ville Fabricating*, 2019 WL 1368621, at *12 (setting forth the three elements of a trade secret). Instead, they argue that the CRM datasets were not the subject of reasonable efforts to maintain their secrecy. [R. 23, pp. 6–7]. Specifically, Defendants point to the lack of confidentiality agreements, noting that neither Lilley nor VanderHyde signed the nondisclosure agreement ("NDA") "template" provided by Plaintiffs. *Id.*; *see also* [R. 1-16 (NDA Template)].

In *Consolidated Industries, LLC v. Maupin*, No. 1:22-cv-01230-STA-jay, 2023 WL 7312493 (W.D. Tenn. Nov. 6, 2023), a case cited by Plaintiffs, the defendants likewise "[made] much of the measures [the plaintiff] did *not* adopt to protect its secrets," like failing to require its employees to sign confidentiality agreements, among other things. *Id.* at *8 (emphasis added). However, the court found the plaintiff's attempts to secure its information (like securing the building with locked doors and a security system, limiting access to its computer system, storing information on a secured server, etc.) to be reasonable under the circumstances. *Id.* at *9. In doing

17

so, the court noted that "what is reasonable for a small company may be different from what is reasonable for a large company." *Id.* (citation omitted). In other words, the existence of signed confidentiality agreement is not dispositive.

At the March 6, 2026 hearing, the Court inquired as to what steps Plaintiffs had taken to secure the CRM datasets. *See* Tr., p. 42.  Plaintiffs' counsel explained that Green Lightning uses password protection for its technologies, including its CRM datasets. *Id.* at 42–43. In addition, its employee handbooks require all employees to treat all information as proprietary, and it has required employees to sign NDAs. *See* [R. 1-15 (Employee Handbook)]; [R. 1-16 (NDA Template)]. While Plaintiffs are unable to produce a signed employee handbook "acknowledgment" form or NDA from Lilley and VanderHyde, they explain that Travis Potter, as the "business operation person," was responsible for obtaining those signed agreements. Mr. Potter disputes this. [R. 23-1, ¶ 4 (Travis Potter Affidavit)]. Regardless, it is clear from the current record that Green Lightning, which holds itself out to be a smaller company formed in 2024, took reasonable measures to protect its trade secrets, including the CRM datasets. As such, and because Defendants do not otherwise dispute that the CRM datasets are trade secrets, the Court finds that the CRM datasets constitute protected trade secrets.

As noted above, to succeed on their trade secret misappropriation claims, Plaintiffs must also demonstrate that the trade secrets at issue, here, the CRM datasets, were misappropriated. *See C-Ville Fabricating*, 2019 WL 1368621, at *12. Like the federal statute, "to establish an act of misappropriation [under the Kentucky statute], the plaintiff must show that the information at issue was used without proper consent, disclosed improperly, or acquired through improper means." *Id.* (citation omitted). Here, the evidence of record indicates that Lilley and VanderHyde exported the CRM datasets in August, September, and October 2025, prior to departing Green Lightning.

18

[R. 18-2, ¶ 13 (Lewis Declaration)]; [R. 1-19 (Lilley Audit Log)]; [R. 1-20 (VanderHyde Audit Log)]. When asked about the timing, Plaintiffs' counsel represented that the exporting took place within days, not months, of Lilley and VanderHyde leaving Green Lightning. And there is evidence of Firewater employees, including Vaders, Travis Potter, and others reaching out to both international and domestic customers of Green Lightning, as well as industry leaders, to inquire about moving their business to Firewater around that same time period, *see* [R. 1-29 (Lyne Affidavit)], and to market and promote Firewater's products. *See* [R. 29-3, ¶¶ 10–18 (Massick Affidavit)]; [R. 29-3 (Exhibits D and E to Massick Affidavit, discussing domestic marketing materials)].

From the best the Court can tell, Plaintiffs do not have any direct evidence of misappropriation, and they instead rely on this circumstantial evidence to argue that Lilley and VanderHyde must have downloaded the CRM datasets for improper use. Again, Travis Potter denies that Firewater obtained Green Lightning's CRM data from Lilley, VanderHyde, or otherwise. *See* [R. 23-1, ¶¶ 13–16 (Travis Potter Affidavit)]. Though the download of CRM datasets by Lilley and VanderHyde raises suspicions, particularly along with the evidence of direct solicitation of Green Lightning customers by Firewater, based on the limited record before the Court, the Court does not find a reasonable likelihood of success on this claim. Though there is evidence that Vaders and Travis Potter reached out to the Australian customer, the record indicates that those communications occurred in August 2025, while much of the downloading took place in September and October 2025. *See* [R. 29-1 (Lyne Affidavit)]; [R. 1-19 (Lilley Audit Log)]; [R. 1-20 (VanderHyde Audit Log)]. The record also indicates that Travis Potter was the primary point of contact for that Australian customer, dating back to February 2025, [R. 1-29, ¶ 3], so there is no reason to believe that Travis Potter needed the CRM datasets to identify and contact this

customer. Moreover, while the parties represent that Lilley is Travis Potter's son-in-law, there is no other indication on the current record that Lilley or VanderHyde have any connection to Firewater or that they otherwise disclosed or used the CRM datasets for any purpose. [R. 23-1, ¶¶ 15–16 (Travis Potter Affidavit)].

As such, the Court finds that, at this stage of the proceedings, Plaintiffs have not demonstrated a likelihood of success on their misappropriation of trade secrets claims. On this point, the Court notes that the Massick Affidavit raises additional concerns related to other Green Lightning customers, including domestic customers. *See* [R. 29-3, ¶¶ 10–18 (Massick Affidavit)]; [R. 29-3 (Exhibits D and E to Massick Affidavit, discussing domestic marketing materials)]. Nevertheless, while this presents a close call, Plaintiffs have failed on the current record to show a reasonable likelihood of success on this claim.

### 3. Patent Infringement

Green Lightning also alleges that Defendant Firewater's production and sale of their 7 Thunders system infringes on Green Lightning's US 12,338,803 B2 Patent ("'803 Patent").[8] [R. 11, pp. 9–12]. Specifically, Green Lightning alleges (1) literal infringement of Claim One of the '803 Patent and (2) infringement under the doctrine of equivalents. *Id.* at 12. For the reasons stated below, the Court will deny Firewater's requested relief because—based on the evidence of record to date—Green Lightning is not likely to succeed on its patent infringement claim under either theory.

---

[8] The '803 Patent shows the inventor as Lewis. Green Lightning does not include any attachments or exhibits showing that Lewis assigned the '803 Patent rights to Green Lightning. However, public records show that Lewis did in fact assign '803 Patent rights to Green Lightning on January 15, 2026. U.S PAT. & TRADEMARK OFFICE, ASSIGNMENT CENTER, https://assignmentcenter.uspto.gov/ipas/search/api/v2/public/download/patent/73484/12 [https://perma.cc/EVF4-UQXE] (last visited Mar. 9, 2026). This fact is not disputed by the parties. *See generally* [R. 11, pp. 9–12]; [R. 23, pp. 9–14]; *see also Motha v. Time Warner Cable, Inc.*, 2016 WL 7034039 at*2 (N.D. Cal. Dec. 2, 2016) ("Patent assignments publicly recorded with the USPTO are the proper subject of judicial notice when they are undisputed.").

### a. Literal Infringement

The plaintiff bears the burden of proving infringement of a utility patent by a preponderance of the evidence. *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1123 (Fed. Cir. 1985) (citations omitted). Determining whether the claims of a utility patent have been literally infringed is a two-step process. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). "The first step is determining the meaning and scope of the patent claims asserted to be infringed. The second step is comparing the properly construed claims to the device accused of infringing." *Id.* (citation omitted); *see also Lantech, Inc. v. Keip Mach. Co.*, 32 F.3d 542, 546 (Fed. Cir. 1994) (citation omitted).

It is a "bedrock principle" of patent law that, through claim construction, both the invention and the scope of a patentee's right of exclusion are defined by the patent's claims. *Phillips v. AWH Corporation*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Claim terms should be construed according to "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1313. Literal infringement requires that the accused product contains every limitation of the asserted claim. *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1105 (Fed. Cir. 1996) (citing *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991)). "The absence of even a single limitation . . . precludes a finding of literal infringement." *Kahn v. General Motors Corp.*, 135 F.3d 1472, 1477 (Fed. Cir. 1998).

Claim One of the '803 Patent claims

[a] modular plasma reactor apparatus, the apparatus: a modular plasma reactor capable of generating a concentrated nitrogen solution for plant growth; a housing surrounding the plasma reactor; an ignition unit removably connected to the plasma reactor: one or more injectors removably connected to the modular plasma reactor in fluidic connection with at least one reservoir and further comprising one or more valves configured to monitor, control or otherwise regulate the flow of fluid to the

plasma reactor; at least one reservoir removably connected to the injector; a *condenser* configured to collect reactive products generated from electric discharge within the modular plasma reactor *placed between the electric discharge and a growth medium* for the plant growth; and a controller communicatively connected to one or more of the ignition unit and the injector.

[R. 1-13, pp. 31–32 (emphasis added)]. As defined in the patent specification, a "growth medium" is "a substance or material that provides essential nutrients and environmental conditions for the growth and proliferation of microorganisms, cells, tissues." *Id.* at 14; *see also Phillips*, 415 F.3d at 1321 ("[T]he specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication." (citation and quotation marks omitted)). A helpful non-limiting example of this would be soil. *See* [R. 1-13, p. 14]; [R. 23, p. 10 n.51]; [R. 29, p. 8].

In its response, Firewater argues that Green Lightning is not likely to succeed on its literal infringement claim because (1) the 7 Thunders system does not use a condenser that is placed between the electric discharge and a growth medium, [R. 23, p. 10], (2) the 7 Thunders system does not use a controller that is communicatively connected to an ignition unit or an injector, *id.* at 10–11, and (3) Green Lightning has not shown that the 7 Thunders system's plasma reactors, injectors, and reservoirs are removably connected, *id.* at 11–12.[9] While the Court is unpersuaded by Firewater's arguments under the "controller" and "removably connected" claim limitations, at this stage and with the current evidence of record, the Court does not believe that Green Lightning is likely to succeed on its claim of literal infringement because the 7 Thunders system does not

---

[9] Firewater also raises the doctrine of prosecution history estoppel as an independent bar for infringement because of a statement from the prosecution of the '803 Patent that—as Firewater argues—limits the patent to only having a "single modular plasma reactor." [R. 23, p. 12]; *see also Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 733 (2002) (explaining prosecution history estoppel). Firewater contends that since the 7 Thunders system uses seven different plasma reactors, it cannot infringe the '803 Patent either literally or under the doctrine of equivalents. [R. 23, p. 12–14]. The statement at issue is "[t]he present invention comprises a single reactor; but it can be connected with other modules of the apparatus to increase capacity and output." *Id.* at 13. The Court disagrees with Firewater's argument because the argument is not "a clear and unmistakable surrender of subject matter." *Amgen Inc. v. Coherus BioSciences Inc.*, 931 F.3d 1154, 1159 (Fed. Cir. 2019). At best for Firewater, this statement is ambiguous. At worst, it shows that '803 Patent prosecution history contemplated multiple plasma reactors in the apparatus. Accordingly, the Court rejects this argument.

appear to use a condenser placed between the electric discharge and a growth medium as Claim One of the '803 Patent requires. The issue for Green Lightning is that, as Firewater currently represents, the 7 Thunders system does not even use a growth medium but instead produces the plasma-activated water that can be stored for later use. *See id.* at 10.

In reply, Green Lightning argues that the condenser that the 7 Thunders system seemingly uses is "placed between" the electric discharge and a growth medium because it "sits between generation and application" in terms of the process. [R. 29, p. 8]. The Court disagrees because the ordinary reading of this limitation indicates that "placed" means physically located, and not referencing a step in a sequential process. Additionally, Figure Two in the '803 Patent specifications clearly shows the growth medium as being physically located between the electric discharge and a growth medium all within the confines of the apparatus. [R. 1-13, p. 4]; *see also id.* at 26 (listing the contents shown in Figure Two); *Electro Med. Sys., S.A. v. Cooper Life Scis., Inc.*, 34 F.3d 1048, 1054 (Fed. Cir. 1994) ("When the meaning of words in a claim is in dispute, the specification and prosecution history can provide relevant information about the scope and meaning of the claim." (citation omitted)); *Bristol Co. P'ship v. Bosch Rexroth Inc.*, 684 F. Supp. 2d 1245, 1254 (D. Colo. 2010) ("[T]he patent specification—the text and figures of the patent that precede the claims—'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" (quoting *Phillips*, 415 F.3d at 1315)).

With step one complete and construing Claim One of the '803 Patent as requiring the condenser to be physically located between the electric discharge and a growth medium, the Court quickly turns to step two of applying that construction to the 7 Thunders system. As mentioned above, and based on the evidence to date, Green Lightning's claim of literal infringement will

likely fail because the 7 Thunders system is purported to not even use a growth medium but instead pumps out the produced plasma-activated water to be stored for later use. [R. 23, p. 10]. Accordingly, the Court does not believe that Green Lightning is likely to succeed in its claim of literal infringement.

### b. Infringement Under the Doctrine of Equivalents

Under the doctrine of equivalents, "a product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997). (quoting *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 609 (1950)). The doctrine is applied to each individual element of a patent claim, not to the claim as a whole. *Id.* at 29. An accused product is "equivalent" if it is only "insubstantially changed" from what is claimed. *Viskase Corp. v. Am. Nat. Can Co.*, 261 F.3d 1316, 1324 (Fed. Cir. 2001). Under the "function-way-result" test, an element of the accused product is only insubstantially changed from what is claimed when one of ordinary skill in the art at the time of infringement would consider the accused equivalent to perform "substantially the same function in substantially the same way" to achieve "substantially the same result." *Graver Tank*, 339 U.S. at 608.

Green Lightning argues that the 7 Thunders system infringes Claim One of the '803 Patent under the doctrine of equivalents because "both Green Lightning's and Firewater's systems perform exactly the same function, in substantially the same way, to yield the same result." [R. 11, p. 12]. In a footnote of its response, Firewater summarily concludes that Green Lightning has waived any argument under the doctrine of equivalents because it failed to make a "showing of equivalence on a limitation-by-limitation basis." [R. 23, p. 9]. Firewater makes no further

argument as to why the doctrine of equivalents should not apply. *See generally id.* at 9–14. Because Green Lightning in its motion incorporates all of the limitation-by-limitation analysis for literal infringement as part of its doctrine of equivalents argument, [R. 11, p. 12 (stating "as explained above")], the Court does not agree that Green Lightning has waived this argument, *see also Bright Response, LLC v. Google, Inc.*, No. 2:07-CV-371-CE, 2010 WL 11056580, at *3 (E.D. Tex. July 30, 2010) (finding no waiver of a doctrine of equivalents argument by a party's simple statement that "each element of each asserted claim . . . is also infringed under the doctrine of equivalents"). Even so, the argument is less than comprehensive. While neither party comprehensively addressed the doctrine of equivalents in its briefing, for the reasons stated below, the Court does not believe that Green Lightning is likely to succeed in its claim under the doctrine of equivalents, at least on the current record.

As with literal infringement, the issue comes down to the claim limitation of the condenser that is required to be placed between the electric discharge and a growth medium. The Federal Circuit has made clear that the prosecution history and prior art of a patent are relevant in determining the scope of equivalence of a given claim limitation. *LRC Elecs., Inc. v. John Mezzalingua Assocs., Inc.*, 194 F.3d 1337 (Fed. Cir. 1999) (noting "the longstanding principle that the prior art restricts the scope of equivalency that the party alleging infringement under the doctrine of equivalents can assert"). "[A] patentee should not be able to obtain, under the doctrine of equivalents, coverage which he could not lawfully have obtained from the PTO by literal claims." *Wilson Sporting Goods Co. v. David Geoffrey & Assocs.*, 904 F.2d 677, 684 (Fed. Cir. 1990); *see also Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1577 (Fed. Cir. 1994) (noting the "proper evaluation of the prior art—i.e., a scope determination of 'what an inventor could have

claimed'—to establish 'the range of permissible equivalents of a claim.'" (quoting *Wilson Sporting*, 904 F.2d at 684)).

Important here is that the claim limitation concerning the condenser and its placement was added to the '803 Patent in order to make it patentably distinct from the prior art. [R. 23-3, pp. 30–31]. In noting this essential difference as the reason for allowing the amendment to the '803 Patent, the examiner stated "[p]rior art does not teach in combination with the other limitations of the independent claim a condenser configured to collect reactive products generated from electric discharge within the modular plasma reactor placed between the electric discharge and a growth medium for the plant growth." *Id.* at 31. With the evidence and arguments that have been presented, at this stage, the Court believes that the condenser limitation limits the scope of equivalents for the '803 Patent. The 7 Thunders system does not use any functionally similar condenser configuration or placement as the condenser limitation described in the '803 Patent. Given that this limitation was added to differentiate the '803 Patent from the prior art, the Court cannot agree at this stage that the 7 Thunders system falls within the scope of equivalence of Claim One of the '803 Patent. Accordingly, the Court does not believe that Green Lightning is likely to succeed in its patent infringement claim under the doctrine of equivalents.

Accordingly, for all the reasons stated above, the Court will deny Plaintiffs' request for a temporary restraining order as it pertains to Green Lightning's claim of infringement of the '803 Patent.

### 4.   Unfair Competition and Trademark Infringement under the Lanham Act

In their complaint, Plaintiffs' Count VIII is labeled as a trademark infringement claim under the Lanham Act. *See* [R. 1, p. 45]. As to that claim, which is asserted against Firewater only, the plaintiffs cite to both 15 U.S.C. § 1114(a), which prohibits trademark infringement, and 15

26

U.S.C. § 1125(a), which governs claims for unfair competition. *Id.* at ¶ 152.  From this, and from the briefing and the parties' arguments at the March 6, 2026 hearing, the Court understands that Plaintiffs' Count VIII is for trademark infringement *and* unfair competition in violation of the Lanham Act. And while Plaintiffs also assert a claim for unfair competition arising under Kentucky common law in their complaint (Count XIV, against all Defendants), the parties' arguments at this stage focus only on Count VIII and the allegations against Firewater. The Court therefore considers whether Plaintiff is likely to succeed on this claim, specifically Count VIII, the trademark infringement and unfair competition claim arising under the Lanham Act.

As the Sixth Circuit has explained, "The Lanham Act makes any person who uses 'any word, term, name, symbol, or device' in a way that is 'likely to cause confusion, or to cause mistake, or to deceive as to . . . affiliation, connection, or association' liable to a senior trademark owner." *Sazerac Brands, LLC v. Peristyle, LLC*, 892 F.3d 853, 856 (6th Cir. 2018) (quoting 15 U.S.C. § 1125(a)(1)(A) and citing 15 U.S.C. § 1114). For instance, 15 U.S.C. § 1125(a)(1)(A) imposes civil liability on any person who, on or in connection with goods or services,

> uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin,[10] false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

15 U.S.C. § 1125(a)(1)(A). Claims arising under this provision are referred to as claims for "unfair competition." *High Five Threads, Inc. v. Michigan Farm Bureau*, No. 1:20-cv-604, 2021 WL 1809835, at *4 (W.D. Mich. May 6, 2021) (citing *Dassault Systémes, SA v. Childress*, 828 F. App'x 229, 234 (6th Cir. 2020)).

---

[10] Plaintiffs' complaint specifically references false designation of origin. [R. 1, ¶ 152].

Similarly, 15 U.S.C. § 1114(1) imposes civil liability on any person who uses in commerce, without consent, "any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive," or who

> [r]eproduce[s], counterfeit[s], cop[ies], or colorably imitate[s] a registered mark and appl[ies] such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive.

15 U.S.C. § 1114(1)(a)–(b). This provision gives rise to claims for trademark infringement. *High Five Threads*, 2021 WL 1809835, at *4 (citing *Dassault*, 828 F. App'x at 234).

To summarize, "[t]he Lanham Act covers trademark infringement as well as a host of other deceptive practices that might loosely be termed 'unfair competition.'" *Johnson v. Jones*, 149 F.3d 494, 502 (6th Cir. 1998). In many Lanham Act cases, a plaintiff's unfair competition claim is similar to their trademark infringement claim in that the plaintiff "asserts that the defendant is using a mark (e.g., trademark, service mark, etc.) so similar to the plaintiff's mark that the public is likely to confuse [the] defendant's product for that of [the] plaintiff." *Id.* On such claims, either for trademark infringement or unfair competition under the Lanham Act, the plaintiff must demonstrate that the mark at issue "creates a likelihood of confusion regarding the origin of goods or services offered by the respective parties." *Progressive Distrib. Servs., Inc. v. United Parcel Serv., Inc.*, 856 F.3d 416, 424 (6th Cir. 2017) (citations omitted); *see also High Five Threads*, 2021 WL 1809835, at *4 ("Both claims [for unfair competition and trademark infringement] require a showing that [the defendant's] conduct created 'a likelihood of confusion regarding the origin of goods or services offered by the respective parties.'" (quoting *Progressive Distrib. Servs.*, 856

28

F.3d at 424)); *Audi AG v. D'Amato*, 469 F.3d 534, 542 (6th Cir. 2006) ("Under the Lanham Act . . . we use the same test to decide whether there has been trademark infringement, unfair competition, or false designation of origin: the likelihood of confusion between the two marks.").[11]

The Sixth Circuit applies an eight-factor test to evaluate the likelihood of confusion in such cases: "(1) strength of the plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) defendant's intent in selecting the marks; and (8) likelihood of expansion of the product lines." *Id.* (citations omitted). These are sometimes referred to as the *Frisch* factors, from *Frisch's Restaurants v. Elby's Big Boy*, 670 F.2d 642 (6th Cir. 1982).

The Sixth Circuit has made clear that these factors "imply no mathematical precision, but are simply a guide to help determine whether confusion is likely." *Progressive Dist. Servs.*, 856 F.3d at 425 (quoting *Homeowners Grp., Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991)) (internal quotation marks omitted). Indeed, "[n]ot all of these factors will be relevant in every case." *Id.* Instead, in the course of applying these factors, "'[t]he ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.'" (citing *Homeowners*, 931 F.2d at 1107).

As to the first *Frisch* factor, "[t]he strength of a mark is a factual determination of the mark's distinctiveness. The more distinct a mark, the more likely is the confusion resulting from its infringement, and therefore the more protection it is due." *Audi*, 469 F.3d at 543 (quoting *Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1264 (6th Cir. 1985)). A mark will be considered "strong and distinctive when 'the public readily accepts it as the hallmark of a particular

---

[11] A claim for trademark infringement under the Lanham Act also requires the plaintiff to show ownership of a registered trademark. *High Five Threads*, 2021 WL 1809835, at *4 (citations omitted). Here, the defendants do not dispute that Plaintiffs own the registered trademarks at issue.

source,'" and "such acceptance can occur when the mark is unique, when it has received intensive advertisement, or both." *Daddy's Junky Music Stores*, 109 F.3d at 280 (quoting *Shoney's*, 759 F.2d 1261).

Here, the Green Lightning logo consists of a bolt of lightning surrounded by a green circle. *See* [R. 1, ¶ 75].[12] The Court does not have any evidence as to whether the public readily accepts this logo as the hallmark of a particular source, or whether it has received intensive advertisement. *See generally Daddy's Junky Music Stores*, 109 F.3d at 280. But even assuming this is not a particularly strong and distinctive mark, such that this factor does not weigh heavily in favor of finding a likelihood of confusion, the other factors, discussed below, *do* present a strong likelihood of confusion.

As to the second factor, relatedness of the goods, the Sixth Circuit has explained that goods are considered related "if the services are marketed and consumed such that buyers are likely to believe that the services, similarly marked, come from the same source, or are somehow connected with or sponsored by a common company." *High Five Threads*, 2021 WL 1809835, *5 (quoting *Daddy's Junky Music Stores*, 109 F.3d at 282–83) (internal quotation marks omitted). Moreover, "if the parties compete directly by offering their goods or services, confusion is likely if the marks are sufficiently similar." *Audi*, 469 F.3d at 543 (quoting *Daddy's Junky Music Stores*, 109 F.3d at 282) (internal quotation marks omitted).

Here, Defendants do not dispute that the products sold by Green Lightning and Firewater are similar, and the Court agrees that, based on the record before it, the goods are extremely similar. Moreover, the Court finds that the products are marketed such that buyers are likely to believe that

---

[12] The parties' respective marks, both with and without words, are attached as Exhibit 1 to this Memorandum Opinion and Order. These images were taken from Plaintiff's complaint, and while one mark appears in grey scale (black and white), the same images shown at the March 6, 2026 hearing clearly demonstrated (and the parties agreed) that Green Lightning's logo is typically displayed in green.

the similarly marked products "come from the same source, or are somehow connected with or sponsored by a common company." *High Five Threads*, 2021 WL 1809835, *5 (quoting *Daddy's Junky Music Stores*, 109 F.3d at 282–83). Perhaps the strongest evidence of this is the series of marketing videos, originally created by Green Lightning for Green Lightning products, which were literally copied, reproduced, and posted online by Firewater to promote Firewater products. *See* [R. 1-3]; [R. 1-4]; [R. 1-5]. Plaintiff played these videos for the Court during the March 6, 2026 hearing. In those videos, Defendants have replaced the Green Lightning logo with Firewater's logo, such that it flashes on the screen in place of the Green Lightning logo, and they have removed the audio referencing the Green Lightning products. Undoubtedly, any customer viewing Green Lightning's marketing videos and then Firewater's marketing videos are likely to believe the two similarly marked products either come from the same source, or are associated with a common company, namely, Green Lightning. *See supra* Section II(A)(1)(b) (discussing the use of Green Lightning's crop testing trials).

The Court also finds support for the second factor in the December 9, 2025 email between Defendant Vaders, in his capacity as Firewater's Global Expansion Leader, and Green Lightning stakeholders. *See* [R. 1, ¶ 10]; [R. 1-8 (Vaders Email)]. In that email, Vaders asks "how the machines are doing" and "how many machines are in the country at the moment," presumably referring to Green Lightning machines. [R. 1-8, p. 2]. He then advises, "[w]anted to let you know that we have moved global distribution of machines under a new name: Firewater Ag LLC. Under this brand we are developing a new series of machines better equipped for shipping and global electrical standards." *Id.* He also notes that Firewater is "tackling maintenance issues, by making a more robust model, producing a better quality product!" *Id.* By marketing the products—which are labeled with similar marks—in this way, customers are likely to believe the Firewater products

are associated with Green Lightning.

Lastly, as to whether the parties compete directly, the defendants agreed during the March 6, 2026 hearing that the two companies had talked to the same customers. Tr., p. 95. They denied having enough information to determine whether Firewater is a direct competitor of Green Lightning, however. The Court disagrees and finds that, on the record before it, Firewater is directly competing with Green Lightning, as evidenced by its attempts—at least some of which have been successful—at encouraging Green Lightning customers to transition to Firewater's products. For example, an Australian customer of Green Lightning has submitted an affidavit explaining that her company had been told by Travis Potter that Green Lightning would no longer be engaged in international exports and instead, Travis Potter "was to take over international sales which would be rebranded as Firewater." [R. 29-1, ¶ 4 (Lyne Affidavit)]. Vaders relayed similar information. *Id.* ¶ 5. As a result, the Australian customer canceled her distribution agreement with Green Lightning and entered into an agreement with Firewater. *Id.* ¶ 6. For this reason and those set forth above, the Court finds this second factor weighs strongly in favor of finding a likelihood of confusion. *See* [R. 1-3]; [R. 1-4]; [R. 1-5]; [R. 1, ¶¶ 79–83]; [R. 1-23]; [R. 29-3, ¶¶ 10–18 (Massick Affidavit)]; [R. 29-3 (Exhibits D and E to Massick Affidavit)].

When considering the third factor, similarity of the marks, "a court should not examine the marks side by side but instead 'must determine, in the light of what occurs in the marketplace, whether the mark will be confusing to the public when singly presented.'" *Progressive Dist. Servs.*, 856 F.3d at 432 (quoting *Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1187 (6th Cir. 1988)) (cleaned up). That is,

> courts must determine whether a given mark would confuse the public when viewed alone, in order to account for the possibility that sufficiently similar marks "may confuse consumers who do not have both marks before them but who may have a general, vague, or even hazy, impression or recollection of the other party's mark."

*Daddy's Junky Music Stores*, 109 F.3d at 283 (quoting *Wynn Oil*, 839 F.2d at 1188) (cleaned up). Additionally, courts should look to the pronunciation, appearance, and verbal translation of the two marks. *Progressive Dist. Servs.*, 856 F.3d at 432 (citation omitted). Overall, this third factor is a "factor of considerable weight." *Daddy's Junky Music Stores*, 109 F.3d at 283 (citation omitted).

Here, the marks (to the extent they include the full names of the entities) contain different words, with different pronunciations: Green Lightning on one hand, and Firewater on the other. *See* [R. 1, ¶ 75]. However, the illustrations included with the marks (which, the Court and parties noted at the hearing, are often used alone, without any words), are far more similar. Both include lightning bolts, surrounded by a round backdrop. *Id.* However, Defendants note that the lightning bolt on the Firewater logo is a "triple bolt," whereas Green Lightning's is a "double bolt," and while Green Lightning's bolt appears against a circle, the Firewater bolt is surrounded by a water droplet with flames. The Court again notes, however, that it should not simply examine the marks side by side. "Moreover, courts must view marks in their entirety and focus on their overall impressions, not individual features." *Daddy's Junk Music Stores*, 109 F.3d 275, 283 (citations omitted). Here, the marks both feature a lightning bolt centered on a round (for Green Lightning) or oval (for Firewater) backdrop. Viewing the marks in their entirety and focusing on their overall impressions, the Court has little trouble concluding that the marks are quite similar, such that they "may confuse consumers who do not have both marks before them but who may have a general, vague, or even hazy, impression or recollection of the other party's mark." *Id.* (quoting *Wynn Oil*, 839 F.2d at 1188).

The color of the marks also proves important to the Court's consideration of this third factor. At the March 6, 2026 hearing, defense counsel emphasized the importance of the coloring,

noting that Green Lightning's mark was green, while Firewater's was blue. *See* Tr. p. 94 ("The color differentiation matters."). However, later in the hearing, Plaintiffs' counsel accessed Firewater's website in real time and found products branded with the Firewater logo in *green*—the same shade of green as Green Lightning's logo. Plaintiffs' counsel published this webpage to the Court, and the Court takes judicial notice of the similar coloring used by Firewater. Tellingly, however, when Plaintiffs accessed the same website on March 8, 2026, "the green logo previously displayed had been removed and replaced with a purple logo." [R. 33]. Regardless, as already explained, the Court finds that the two marks are sufficiently similar, such that the third factor weighs in favor of finding a likelihood of confusion.

The Court turns to the fourth *Frisch* factor, evidence of actual confusion. As to this factor, the defendants repeatedly emphasize the lack of evidence of actual confusion. *See, e.g.*, [R. 23, p. 18]. However, while it is true that "such evidence is the best indicator of likelihood of confusion, 'the absence of actual confusion evidence is inconsequential.'" *Audi*, 469 F.3d at 543 (quoting *PACCAR Inc. v TeleScan Techs.*, 319 F.3d 243, 252 (6th Cir. 2003), *abrogated on other grounds* by *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004)). Thus, while Plaintiffs conceded at the March 6, 2026 hearing that they were unaware of any evidence of actual confusion, the absence of such evidence is inconsequential. And, as already noted, not all of the *Frisch* factors will be relevant in every case. *Progressive Dist. Servs.*, 856 F.3 at 425.

As to the fifth factor, marketing channels used, courts consider "the similarities or differences between the predominant customers of the parties' respective goods or services," and "whether the marketing approaches employed by each party resemble each other." *Audi*, 469 F.3d at 543 (quoting *Daddy's Junky Music Stores*, 109 F.3d at 285) (internal quotation marks omitted). On this point, Plaintiffs point to Firewater's use of Green Lightning's trial results, their marketing

videos, their customer list, and the fact that both entities utilize social media to market their products. *See, e.g.*, [R. 29, p. 11]. For their part, Defendants acknowledge that both companies "operate in the energy and agricultural technology space and their products may be encountered within similar industry channels," but they argue that this "surface-level overlap does not establish confusion." [R. 23, p. 17]. And at the March 6, 2026 hearing, Defendants were asked whether they agreed that the parties used similar marketing channels, to which defense counsel responded, "I think some of them are and some of them are not." Tr., pp. 96–97.

As already explained, strong evidence exists on this factor. Firewater literally copied Green Lightning's marketing videos, but replaced the Green Lightning logo (and/or audio references to Green Lightning) with Firewater's logo, such that it flashes on the screen in place of the Green Lightning logo (and/or audio references to Green Lightning), and they have removed the audio referencing the Green Lightning products. *See* [R. 1-3]; [R. 1-4]; [R. 1-5]. Firewater does not dispute using these videos to market its own products. Similarly, Firewater copied and used Green Lightning's test results and marketed those results as its own, even though such test results were based on Green Lightning's testing during the 2025 growing season, before the 7 Thunders machine was even operational. [R. 1-23 (Jan. 21, 2026 Email from Ryelee Potter, boasting results of a corn yield trial performed by Green Lightning but claiming the grower achieved the yields "by supplementing . . . with Firewater")]; *see also* [R. 1, ¶ 83 (displaying a screenshot from Firewater's website on September 23, 2025 that publishes Green Lightning's potato testing trial but claims the results were achieved using Firewater's product)]. Defendants do not dispute this, and how could they? Considering Firewater's copying of Green Lightning's marketing videos and test results, the Court finds that "the marketing approaches employed by each party resemble each other." *Audi*, 469 F.3d at 543 (quoting *Daddy's Junky Music Stores*, 109 F.3d at 285) (internal

quotation marks omitted). More accurately, they are nearly identical.

The sixth *Frisch* factor requires the Court to consider the likely degree of customer care. As to this factor, the Sixth Circuit has explained that "[t]he degree of care with which customers likely purchase the parties' goods or services may affect the likelihood of confusion." *Daddy's Junky Music Stores*, 109 F.3d at 285.

> Generally, in assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution. However, when a buyer has expertise or is otherwise more sophisticated with respect to the purchase of the services at issue, a higher standard is proper. Similarly, when services are expensive or unusual, the buyer can be expected to exercise greater care in her purchases. When services are sold to such buyers, other things being equal, there is less likelihood of confusion.

*Id.* (quoting *Homeowners Group*, 931 F.2d at 1111).

In the present case, the defendants argue that the customers of these products are sophisticated and not impulse buyers; they are instead commercial growers, agronomists, agricultural engineers, and institutional farm operators. [R. 23, p. 17]. But to the extent these are sophisticated purchasers, or the goods might be considered expensive or unusual, such that buyers would typically exercise greater care, their discernment and scrutiny would be severely undercut by Firewater's narrative that Green Lightning was no longer handling international distribution and instead, that role would be handled by Firewater. The Court has already discussed the various instances in which Firewater marketed this particular narrative to Green Lighting stakeholders and customers. [R. 1-8 (Vaders Email)]; [R. 29-1 (Lyne Affidavit)]. Thus, under the circumstances of this case and on the current record, the Court finds this sixth factor is neutral, at best.

The seventh *Frisch* factor addresses the defendant's intent in selecting the mark. The Sixth Circuit has explained that "[t]he intent of [the] defendants in adopting [their mark] is a critical factor, since if the mark was adopted with the intent of deriving benefit from the reputation of [the

plaintiff], that fact alone may be sufficient to justify the inference that there is confusing similarity." *Audi*, 469 F.3d at 544 (quoting *Frisch's*, 670 F.2d at 648). On this issue, defense counsel argued at the March 6, 2026 hearing that there was no specific evidence on intent. Tr., p. 97. The Sixth Circuit has made clear, however, that "intent need not be provided by direct evidence of intentional copying," and instead, "[i]ntent may be inferred." *Id.*; *see also PACCAR*, 319 F.3d at 254 ("Direct evidence of intentional copying is not necessary to prove intent." (quoting *Daddy's Junky Music Stores*, 109 F.3d at 287)).

For example, intent can be shown by "the use of a contested mark with knowledge of the protected mark at issue." *PACCAR*, 319 F.3d at 254 (quoting *Daddy's Junky Music Stores*, 109 F.3d at 287). Here, there is no dispute that Firewater, which was founded and is managed by Travis Potter, was aware of the protected mark. Travis Potter was a founding member and manager of Green Lightning and was obviously aware of its registered trademark.

Additionally, intent can be shown by the defendant's "use of the marks on its web sites, such as including the marks in its domain names, repeating the marks in watermarks, and mimicking the distinctive scripts of the marks." *Id.* at 254. For example, where a defendant knew that certain marks were associated with trucks manufactured by the plaintiff corporation, and it "used the marks in its domain names so that dealers and other customers could easily access its web sites to find" those trucks, the court could infer intent. *Id.* Similarly, in the present case, Firewater, through Travis Potter, knew that Green Lightning's marks are associated with Green Lightning's products, and its use of such a similar mark on its own website and social media sites, which included literal copying of Green Lightning's marketing videos and crop testing trial results, suggests an intent to lure customers to its own site to find similar products.

Additional facts in this case are also relevant to this intent factor. Sometime in late August

or early September 2025, Lewis, Travis Potter, and other Green Lightning investors "discussed a potential separation framework under which certain, limited personnel would transition to a contemplated 'NuCo' focused on non-U.S. sales of Green Lightning technology while Green Lightning retained a defined core team." [R. 1, ¶ 72]; *see also* [R. 23-1, ¶¶ 5–7 (Travis Potter Affidavit)]. While a formal agreement was never finalized, it is clear from the record that Travis Potter planned to operate a new company focused on international distribution, while remaining associated with Green Lighting as the "core team." [R. 1, ¶ 72]; *see also* [R. 23-1, ¶ 5 (Travis Potter Affidavit, stating that Firewater was the vehicle through which "the separated operations would be conducted" and its purpose "was to serve as the operational successor for the transitioning business functions")]. It appears clear that the Firewater logo was developed during these negotiations, or at a time when the parties contemplated that Firewater would remain associated with Green Lightning, further indicating Firewater's intent in adopting such a similar mark. For this reason, and those stated above, this seventh factor weighs strongly in favor of finding a likelihood of confusion.

The eighth and final *Frisch* factor considers the likelihood of expansion of the product lines. The parties did not address this factor in their briefing, and Plaintiffs stated at the March 6, 2026 hearing that he was not sure this factor was applicable in this case. Based on the information before the Court, the Court agrees that this factor is irrelevant. *See Audi*, 469 F.3d at 545 (finding that this factor "need not be analyzed" because the parties' product lines "already overlap"); *PACCAR*, 319 F.3d at 245 (finding this factor irrelevant where the two parties already competed in the same field providing the same services).

In sum, the Court finds that, based on the record before it, the *Frisch* factors weigh in favor of finding a likelihood of confusion. This analysis applies with equal force to Plaintiffs' trademark

infringement claim as to its unfair competition claim under the Lanham Act, to the extent Plaintiffs rely on its trademark and Firewater's use of a similar mark to support both claims.

However, as noted above, "[t]he Lanham Act covers trademark infringement as well as a host of other deceptive practices that might loosely be termed 'unfair competition.'" *Johnson*, 149 F.3d a 502. "One such form of unfair competition is the false designation of origin." *Id.* Specifically, the Lanham Act's unfair competition provision, § 1125, imposes liability on

> [a]ny person who, on or in connection with goods or services . . . uses in commerce . . . *any false designation of origin, false or misleading description of fact, or false or misleading representation of fact*, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

15 U.S.C. § 1125(a)(1)(A) (emphasis added). Thus, it is possible for a plaintiff to succeed on an unfair competition claim under the Lanham Act, even if the defendant "has not produced a product to which he has applied a mark so like the plaintiff's that the public is likely to believe that the product was produced by the plaintiff." *Johnson*, 149 F.3d at 503. Instead, in some cases, a false designation of origin theory has succeeded where "the defendant has taken the plaintiff's product and has represented it to be his own work." *Id.* Referring to such cases, the Sixth Circuit has stated that "[i]t is difficult to imagine how a designation of origin of a product could be more false, or could be more likely to cause confusion or mistake as to the actual origin of the product." *Id.*

And importantly, in those types of false designation of origin cases, courts "need not inquire about the distinctiveness or secondary meaning of the trademarks involved, because the trademarks are not the issue." *Id.* "In fact," in such cases, "most of the eight *Frisch* factors are irrelevant to [the court's] inquiry because they deal with the relationship between the plaintiff's and defendant's trademarks, not their products." *Id.* For example, in *Johnson v. Jones*, the plaintiff-architect had drawn up plans for a client's home but was later terminated from the project. *Id.* at

499. The client hired a new architect, who then acquired the original architect's drawings and plans. *Id.* The new architect removed the original architect's name and seal from the drawings and replaced them with his own name and seal, then submitted them to the city inspector for approval. *Id.* The plaintiff ultimately brought a false designation of origin claim under the Lanham Act against the new architect.

In considering this claim, the Sixth Circuit explained that "[a] description of origin will be considered false if it creates a likelihood of confusion in the consuming public."[13] *Id.* at 502. On that issue, the Court found most of the *Frisch* factors to be irrelevant, but it did note that the parties provided the same kind of services, used similar marketing channels, and competed against each other in the same market. *Id.* at 503. Further, the Sixth Circuit noted,

> it is obvious beyond dispute that by taking [the plaintiff's] name and seal off of the plans and replacing them with his own, [the defendant] intended for people to assume that the plans were his, and not [the plaintiff's]. Indeed, this Court is hard-pressed to imagine what effect these actions could possibly have other than to convince anyone who looked at the plans that they were [the defendant's] work. Few are the cases demonstrating a more obvious and imminent likelihood of confusion.

*Id.*; *see also Mike Vaughn Custom Sports, Inc. v. Piku*, 15 F. Supp. 3d 735, 752 (E.D. Mich. 2014) (finding allegations that the defendants removed the plaintiff's brand name from products and attached their own brand name, thereby passing them off as their own, as sufficient to state a false designation of origin claim under the Lanham Act).

Similarly, in this case, Plaintiffs could likely succeed on an unfair competition claim under the Lanham Act, based on a false designation of origin theory, irrespective of the parties' marks.

---

[13] The Court made this point when considering the likelihood of confusion, but it also noted that, to succeed on a false designation of origin claim, another element must be shown: "the false designation must have a substantial economic effect on interstate commerce." *Johnson*, 149 F.3d at 502. In the present case, the parties did not address this argument, but it is clear on the current record that both companies distribute their products beyond state lines, and Firewater used the Internet and other methods to mass market its competing products.

This conclusion is supported in part by the Court's consideration of the *Frisch* factors, outlined above, even though not all of the eight factors are relevant. For example, for the reasons already stated, Green Lightning and Firewater provide similar products, use similar marketing channels, and compete against each other in the same market. Moreover, as already discussed, the evidence of record indicates that Firewater utilized Green Lighting marketing videos and materials (like crop trial test results), but replaced all references to Green Lightning with references to Firewater (including Firewater's logo). *See, e.g.*, [R. 1-3]; [R. 1-4]; [R. 1-5]. These actions are particularly troubling when coupled with Firewater's airing of the narrative that Green Lightning no longer handled international distribution and Firewater would instead be handling any such distribution. *See* [R. 1-8 (Vaders Email)]; [R. 29-1 (Lyne Affidavit)]. Simply put, from the record presently before the Court, it seems obvious that Firewater intended for people, especially potential customers, to assume the marketing videos and materials were Firewater's, not Green Lightning's, thereby supporting a false designation of origin claim under the Lanham Act.

The Court also notes that defense counsel addressed such a claim at the March 6, 2026 hearing. Counsel specifically stated that, with respect to unfair competition claims under the Lanham Act based on advertising, those claims did not relate to trademark usage. *See* Tr., p. 93. Moreover, defense counsel explained, the defendants had taken down the advertisements at issue, and they would also look into taking down any such advertisements on Firewater UK's website. *Id.* So, counsel argued, those aspects of the Lanham Act could be addressed in the Court's order, but to a certain extent, they had already been "dealt with." *Id.* While the Court appreciates the defendants' willingness to remove any offending material, an order remains necessary to ensure compliance going forward.

Accordingly, for all of the reasons set forth above, the Court finds that it is likely that Plaintiffs can succeed on their unfair competition and trademark infringement claims under the Lanham Act, under each of the theories addressed above.

### 5. False Advertising under the Lanham Act

Plaintiffs allege false advertising under the Lanham Act, specifically 15 U.S.C. § 1125(a). This claim (Count VI) is against Defendant Firewater only. To succeed on this claim, the plaintiffs must show that Firewater "(1) made false or misleading statements of fact about their products, (2) which actually deceived or had a tendency to deceive a substantial portion of the intended audience, and (3) likely influenced the deceived consumers' purchasing decisions." *Wysong Corp. v. APN, Inc. (17-1975)*, 889 F.3d 267, 270 (6th Cir. 2018) (citation omitted). They must also show a link to interstate commerce and a causal link between the false advertising and their injuries. *Id.* at 270 n.1 (citing 15 USC § 1125(a)).

Plaintiffs argue that Firewater disseminated false and misleading statements in commercial advertising materials "that are material to purchasing decisions and likely to deceive the relevant market." [R. 11, pp. 13–14]. In response, Defendants dispute that Plaintiffs can meet the standard for injunctive relief as to this claim; however, they state that they "will stipulate to an order restraining the use of the specific marketing materials identified in Plaintiffs' Motion pending further proceedings, which will address Plaintiffs' concerns without requiring the Court to adjudicate contested factual issues or reach the merits of the Lanham Act claim." [R. 23, p. 19].

The Court raised the possibility of such an agreement at the March 6, 2026 hearing. While both parties raised some concerns with the scope and specificity of such an agreement,[14] the parties

---

[14] For example, defense counsel noted that the advertisements discussed at the March 6, 2026 hearing are from Defendant Firewater UK's website, and defense counsel does not represent that specific defendant. The Court notes, however, that Plaintiffs' false advertising claim (Count VI) is against Firewater only, and Plaintiffs have attached

ultimately agreed that the Court should enter a temporary restraining order as to the false advertising claim, and the Court will do so. *See* Tr., pp. 83–84.

### 6. Breach of Employment Agreements

Plaintiffs bring a breach of contract claim against Defendants Travis Potter, Ryelee Potter, Lilley, Blessings Abundantly, LLC, Smith, VanderHyde, Vaders, and Obeng-Mayaresa (Count IX). [R. 1, ¶¶ 168–74]. Plaintiffs claim that these employees breached their employment agreements, specifically their obligations not to compete for one year after termination, not to solicit Green Lightning's employees and clients for a period of two years, and to refrain from using Green Lightning's proprietary information. *Id.* To succeed on this breach of contract claim, the plaintiffs "must establish three things: (1) existence of a contract; (2) breach of that contract; and (3) damages flowing from the breach of contract." *Ebonite International, Inc. v. Hickland*, No. 5:17-CV-00080-TBR, 2018 WL 2107779, at *7 (W.D. Ky. May 7, 2018) (quoting *Metro Louisville/Jefferson Cnty. Gov. v. Abma*, 326 S.W.3d 1, 8 (Ky. Ct. App. 2009)) (internal quotation marks omitted).

In analyzing the likelihood of success on these claims, the Court first notes that there is no evidence demonstrating the existence of signed employment agreements between Green Lightning and Travis Potter,[15] Rylee Potter, Lilley, or VanderHyde. Instead, Plaintiffs attach as exhibits to their complaint a template NDA, [R. 1-6], as well as an employee handbook, which contains a

---

exhibits in support of that claim that appear to be from Firewater's social media accounts. *See* [R. 1-3]; [R. 1-4]; [R. 1-5]; [R. 1, ¶¶ 79–83]; [R. 1-23].

[15] At the March 6, 2026 hearing, Plaintiffs argued that Travis Potter's employment agreement is the Operating Agreement. *See also* [R. 33, p. 2, n.1]. However, Plaintiffs have not pointed to any non-compete, non-solicitation, or confidentiality provisions in that Operating Agreement. *See generally* [R. 1-1]. To the extent Plaintiffs allege that Travis Potter breached his Operating Agreement, the Court understands those allegations are made in support of Count X. *See* [R. 1, ¶¶ 175–80]. That claim does not form the basis of Plaintiffs' request for a temporary restraining order. *See* [R. 11]. Accordingly, the Court does not consider the Operating Agreement as the relevant "employment agreement" for the present claim.

43

nondisclosure provision and a confidentiality agreement, as well as an "Acknowledgement of Receipt" page. *See* [R. 1-15]. However, at the March 6, 2026 hearing, Plaintiffs suggested that they had recently located several signed "acknowledgments" from Green Lightning employees, referring to the "Acknowledgment of Receipt" page of the employee handbook. *See* [R. 33, pp. 1–2]. Plaintiffs have since advised, however, that while they have located such forms for individuals not party to this case, they have not located any such forms for Travis Potter, Ryelee Potter, Lilley, or VanderHyde. *Id.* While Plaintiffs suggested at the hearing that, in the absence of signed employment agreements with these individuals, such agreements were implied by their employment with the company and moreover, Travis Potter may have been responsible for failing to secure the signed agreements. *See* Tr., p. 101. At this time, however, there is not enough evidence (nor developed argument) before the Court to establish that Travis Potter, Ryelee Potter, Lilley, or VanderHyde entered into employment agreements containing non-compete, non-solicitation, or non-disclosure and confidentiality provisions. As such, Plaintiffs have failed to show that they are likely to succeed on their breach of contract claim, specifically Count IX, against these individuals.

The Court next turns to Defendants Vaders and Obeng-Mayaresa. The parties do not dispute that Defendants Vaders and Obeng-Mayaresa entered into signed agreements expressly including non-compete and non-solicitation clauses, as well as a confidentiality clause. *See* [R. 1-11, ¶¶ 6, 7 (Sales & Services Agreement between Green Lightning and Vaders)]; [R. 1-12, ¶¶ 6, 7 (Employment Agreement between Green Lightning and Obeng-Mayaresa)]. However, as to Obeng-Mayaresa, there is no evidence that this defendant works or has worked for Firewater in any capacity, nor evidence that she solicited Green Lightning customers, or that she disclosed confidential information. As such, and at this stage of the proceedings, the Court finds that

44

Plaintiffs have failed to demonstrate a likelihood of success on their breach of contract claim against Obeng-Mayaresa.

On the other hand, Defendants acknowledge that Defendant Vaders currently works for Firewater,[16] which, as the Court has already explained, is a competing venture. And evidence of record indicates that Vaders solicited Green Lightning customers on Firewater's behalf as early as August 2025. *See* [R. 29-1, ¶¶ 4–5 (Lyne Affidavit)]. Defendants do not dispute these facts, but instead briefly suggest—in a footnote in their response brief—that the non-compete clause in Vaders's employment agreement might be unenforceable given its geographic scope. [R. 23, p. 21 n. 92]. Beyond this footnote, Defendants do not develop this argument further. Thus, while Defendants may be able to present evidence and argument in support of this defense at a later stage, at this early stage of the proceedings and for the limited purpose of this temporary restraining order, the Court finds that Plaintiffs have demonstrated a likelihood of success on the breach of contract claim against Vaders.

Lastly, the Court considers Defendants Blessings Abundantly, LLC and Smith. The parties do not dispute that Smith, on behalf of Blessings Abundantly, LLC, entered into a signed employment agreement, dated May 8, 2024, with Green Lightning. *See* [R. 1-21]. That agreement contains a confidentiality and non-disclosure provision. *Id.* ¶ 4. However, Plaintiffs do not allege, nor provide any evidence suggesting, that Smith or Blessings Abundantly, LLC breached that provision. Instead, Plaintiffs breach of contract claim against these defendants appears to be centered on Smith's current employment with Firewater. But at present, there is no evidence that

---

[16] At the March 6, 2026 hearing, defense counsel could not say for certain whether Vaders is a contractor or employee with Firewater, but he acknowledged that there was "some type of contract" between Vaders and Firewater. *See* Tr., p. 108. The Court notes that Vaders is listed on Firewater's website, specifically the "Meet the Team" page, with his role designated as "Global Expansion." *See* Meet the Team, https://www.firewaterag.com/team-4 (last visited March 13, 2026).

Smith is bound by a non-compete provision. As a result, the Court finds that Plaintiffs have failed to demonstrate a likelihood of success on their breach of contract claim against Defendants Blessings Abundantly, LLC and Smith.

In sum, based on the limited record before the Court, Plaintiffs have not shown that they are likely to succeed on their breach of contract claim (Count IX) against Travis Potter, Ryelee Potter, Lilly, VanderHyde, Obeng-Mayaresa, Blessings Abundantly, LLC or Smith. However, Plaintiffs have shown a likelihood of success on their breach of contract claim against Vaders.

### B.  Irreparable Harm

Having determined that Plaintiffs are likely to succeed on at least some of their claims, the Court next turns to irreparable harm. "Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated by money damages." *Owensboro Specialty Polymers, Inc. v. Daramic, LLC*, No. 4:20-CV-163-JHM, 2020 WL 13577473, at *1 (W.D. Ky. Sept. 25, 2020). A harm is typically not irreparable if it is fully compensable by money damages. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 511 (6th Cir. 1992); *see also SEIU Health Care Michigan v. Snyder*, 875 F. Supp. 2d 710, 723 (E.D. Mich. 2012) ("Monetary damages, however substantial, do not constitute irreparable harm." (citation omitted)). "However, an injury is not fully compensable by money damages if the nature of the plaintiff's loss would make damages difficult to calculate." *Basicomputer*, 973 F.2d at 511 (citation omitted).

Moreover, to obtain a temporary restraining order, the harm alleged "must be 'so immediate' that relief is necessary before a preliminary injunction hearing can occur." *Touzi Tech LLC v. BioFuel Mining, Inc.*, No. 3:22-cv-00002-GFVT, 2022 WL 127970, at *1 (E.D. Ky. Jan. 13, 2022) (citing *Branch Banking and Trust Co. v. Jones*, 5:18-cv-610-JMH, 2018 WL 10772684, at *2 (E.D. Ky. Nov. 19, 2018)) (internal quotation marks omitted). And the moving party must

show that, in the absence of injunctive relief, "they will suffer 'actual and imminent' harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006) (citations omitted); *see also Bradley v. Detroit Bd. of Ed.*, 577 F.2d 1032, 1035 (6th Cir. 1978) (explaining that injunctive relief should not be based on speculation and "unfounded fears").

Importantly, in this case, the Court has already concluded that the Plaintiffs are likely to succeed on the merits of their claim for trademark infringement and unfair competition under the Lanham Act. *See supra* Section II(A)(4). That is, there is a reasonable probability that the plaintiffs can demonstrate a likelihood of confusion between the two marks. The Sixth Circuit has explained that "irreparable injury 'ordinarily follows when a likelihood of confusion or possible risk to reputation appears' from infringement or unfair competition." *Microsoft Corp. v. McGee*, 490 F. Supp. 2d 874, 882 (S.D. Ohio 2007) (quoting *Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1056 (6th Cir. 1999)); *see also Wynn Oil Co. v. American Way Service Corp.*, 943 F.2d 595, 608 (6th Cir. 1991). That irreparable injury "flows 'both from the potential difficulty of proof of [the] plaintiff's damages, and also from the impairment of intangible values,'" such as the strength of the plaintiff's mark and its reputation and goodwill. *Wynn Oil Co.*, 943 F.2d at 608 (quoting *Koppers Co., Inc. v. Krupp-Koppers GmbH*, 517 F. Supp. 836, 850 (W.D. Pa. 1981)); *see also Koppers*, 517 F. Supp. at 850. Thus, "[s]ince the Court has found that [Plaintiffs have] established a likelihood of confusion, the Court necessarily finds that [Plaintiffs have] shown irreparable injury based upon [their] trademark claims." *Microsoft Corp.*, 490 F. Supp. 2d at 882; *see also Circuit City Stores*, 165 F.3d at 1056.

Additionally, the Court has found that Plaintiffs have demonstrated a likelihood of succeeding on the merits of their claims for breach of fiduciary duties in a number of ways,

including by proving that Travis Potter's company, Firewater, competes in the same market, used Green Lightning's technology to create a competing product, copied Green Lightning's crop testing trial results and claimed the results were based on Firewater's technology, copied Green Lightning's advertising videos with Firewater's own logo superimposed over any mention of Green Lightning; and solicits Green Lightning customers. *See supra* Section II(A)(1)(b). The law is clear that "[t]he loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute." *Basicomputer*, 973 F.2d at 511 (citation omitted). Here, the record indicates that Firewater and its employees began presenting Green Lightning stakeholders and customers with the false narrative that Green Lightning was no longer engaging in international distribution and that role would instead be handled by Firewater. [R. 1-8 (Vaders Email)]; [R. 29-1 (Lyne Affidavit)]. This resulted in at least one customer cancelling its contract with Green Lightning and entering into a contract with Firewater. [R. 29-1]. This loss of customer goodwill and reputational damage is difficult to calculate, thereby amounting to irreparable injury.

The Court's finding of irreparable harm is not altered by Defendants' argument in their response brief that Plaintiffs delay in seeking injunctive relief undercuts their claim of irreparable harm. [R. 23, pp. 22–23]. They argue that, "[w]here a plaintiff is aware of the alleged misconduct but waits before seeking emergency relief, courts routinely find the claimed injury is not immediate." *Id.* at 23. The Court finds little merit in this argument. First, Defendants allege only that Travis Potter and Lewis, and others, knew of Firewater's formation in mid-2025 and began discussing Travis Potter's separation from Green Lightning in September 2025, with these discussions and negotiations continuing for several weeks thereafter, according to Defendants. *See id.* at 22–23; *see also* [R. 23-1 (Travis Potter Declaration)]. According to Defendants' own

briefing, Plaintiffs' counsel then sent a demand letter (with a copy of the draft complaint) on December 30, 2025, and Defendants responded by January 9, 2026. [R. 23, pp. 22–23]. Just over a month later, on February 13, 2026, this action was filed. The Court does not find this brief delay to be unreasonable, given the parties' unsuccessful attempts to negotiate Travis Potter's separation from Green Lightning and the complexity of some of the underlying claims. Accordingly, the Court finds the irreparable harm element has been satisfied.

### C.  Balance of Harms

"The third factor for a court to consider is 'whether the issuance of the injunction would cause substantial harm to others.'" *Dinter*, 627 F. Supp. 3d at 733 (citation omitted).  "While this factor is generally concerned with harm to third parties, courts also often consider the 'balance of hardships' between the parties if an injunction were to issue." *Id.* (citations omitted).

Plaintiffs argue that a temporary restraining order would safeguard Green Lightning's proprietary information, goodwill, client relationships, business reputation, and its common law and contractual rights. [R. 11, pp. 22–23]. And, they argue, to the extent the defendants may complain of hardship, it "is the result of their own unlawful actions and should be ignored." *Id.* at 23. In response, Defendants argue that a temporary restraining order would "materially restrict Defendants' ability to operate during what Plaintiffs themselves describe as a critical sales season." [R. 23, p. 24]. Defendants also appear to argue that the balance of harms weighs against a temporary restraining order because some of the claims may be subject to mandatory arbitration and "Plaintiffs' alleged harms are largely economic and compensable if proven." *Id.*

The Court understands Defendants' concerns about restricting its business operations during a busy sales season. However, as already explained, the plaintiffs have demonstrated a likelihood of success on at least some of their claims, and any such harm to Defendants would be self-inflicted. *See H.H. Franchising Systems, Inc. v. CareSmart Solutions, Inc.*, No. 1:21-cv-575,

2022 WL 4274278, at *6 (S.D. Ohio Sept. 15, 2022) ("When the harm to a defendant is self-inflicted, it is outweighed by the irreparable harm to the party seeking injunctive relief." (citation omitted)); *Brake Parts, Inc. v. Lewis*, 443 F. App'x 27, 33 (6th Cir. 2011) (discounting harm to the defendant when it "knowingly and illegally placed itself in the position to be placed out of business"); *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 382 (6th Cir. 2006) (dismissing the harm to a defendant enjoined from counterfeiting as "hardly a legally cognizable one"); *Hickman v. Turitto*, No. 1:06-CV-151, 2007 WL 1080090, at *3 (E.D. Tenn. Apr. 9, 2007) (finding that the defendants were likely to suffer little, if any harm, where they were enjoined "from doing something he already should not be doing"). Moreover, the Court is not aware of any potential harm to third parties.

The Court therefore finds that Plaintiffs' harms (in the absence of a temporary restraining order) outweigh the potential harm to Defendants if such an order is issued. This third factor therefore weighs in favor of issuing a temporary restraining order.

### D. Public Interest

Finally, the Court must analyze whether the public interest favors granting a temporary restraining order. On this point, Plaintiffs argue that the public has an interest in enforcing contracts; protecting trade secrets; preventing customer confusion; and preventing patent infringement, among other things. [R. 11, pp. 23–24]. Defendants agree that "[t]e public interest favors enforcement of valid contracts and protection of legitimate trade secrets, but it also favors free competition and adherence to arbitration agreements according to their terms." [R. 23, p. 24].

The Court has already addressed Defendants' arbitration arguments, and Defendants' repeated reference to that agreement has little impact here, where injunctive relief (like a temporary restraining order) is contemplated by the agreement itself. Moreover, the law is clear that the public

50

interest is served by enforcing the contracts and laws at issue. *See Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 551 (6th Cir. 2007) ("Enforcement of contractual duties is in the public interest."); *Radiant Glob. Logistics, Inc. v. Furstenau*, 368 F. Supp. 3d 1112, 1135 (E.D. Mich. 2019) (". . . [I]t is 'axiomatic that that the public has an interest in the enforcement of the legislatively enacted laws.'" (quoting *Kelly Services, Inc. v. Noretto*, 495 F. Supp. 2d 645, 660–61 (E.D. Mich. 2007))).

The Court therefore finds that this final factor also weighs in favor of issuing a temporary restraining order.

## III.    CONCLUSION

For the reasons set forth above, the Court finds that Plaintiffs have demonstrated a likelihood of success on the merits of at least some of their claims; they are likely to suffer irreparable harm in the absence of a temporary restraining order; the balance of harms weighs in Plaintiffs' favor; and a temporary restraining order would serve the public interest. Accordingly, the Court will grant Plaintiffs' request for a temporary restraining order, as outlined below.

To be clear, nothing in this Memorandum Opinion and Order shall preclude Plaintiffs or Defendants from arguing in favor of or against a preliminary injunction as to any of the claims discussed herein, if such arguments are warranted after the completion of limited discovery. *See generally Optic-Electronic Corp. v. United States*, 683 F. Supp. 269, 271 (D.D.C. 1987) (denying motion for temporary restraining order but noting that the plaintiff may ultimately prevail on its request for a preliminary injunction, in which case "the Court can grant the same relief that plaintiff seeks now in its motion for temporary restraining order").

Accordingly, the Court being sufficiently advised, **IT IS HEREBY ORDERED** as follows:

51

1. Plaintiffs' request for a temporary restraining order is **GRANTED IN PART**.

2. Defendants Travis Potter and Firewater, and their officers, agents, servants, employees, attorneys, and all persons acting in concert and participating with them, are **TEMPORARILY ENJOINED** from

   a. competing against Green Lightning, including but not limited to, selling similar products or technology;

   b. soliciting, either directly or indirectly, Green Lightning's current or prospective customers, distributors, or suppliers;

   c. engaging in any and all forms of false or deceptive advertising and unfair competition, including but not limited to informing current or prospective customers, vendors, brand ambassadors, or other stakeholders that Green Lightning is "going out of business" or is otherwise affiliated with Firewater, using Green Lightning's marketing videos or test trial results to misrepresent origin, sponsorship, or affiliation;

   d. engaging in any and all forms of unfair competition and trademark infringement, including but not limited to the use of the marks identified in Exhibit 1 to this Memorandum Opinion and Order, or marks similar to the marks identified in Exhibit 1 to this Memorandum Opinion and Order; and

   e. employing or contracting Defendant Vaders in any capacity or manner that would violate the Sales & Services Agreement between Green Lightning and Vaders, [R. 1-11].

3. Defendants Travis Potter and Firewater, and their officers, agents, servants, employees, attorneys, and all persons acting in concert and participating with them, **SHALL**

    a.   return to Green Lightning any of the videos, test trial results, or CRM datasets outlined above;

    b.   cease any currently pending sale or offer of sale of any 7 Thunders machine or similar product that competes with Green Lightning; and

    c.   provide a verified accounting of all 7 Thunders machines made, used, sold, offered for sale, or imported or exported.

4. Defendant Vaders and his agents, servants, employees, attorneys, and all persons acting in concert and participating with him, **SHALL** comply with all post-employment restrictive covenants in the Sales & Services Agreement between Green Lightning and Vaders, [R. 1-11], including the non-competition, non-solicitation, and confidentiality clauses.

5. All parties **SHALL** take any and all necessary steps to maintain and preserve all potentially relevant evidence regarding the allegations in the complaint, [R. 1], the Amended Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Discovery, [R. 11], and the counterclaims, [R. 36]. All parties are **PROHIBITED** from destroying, deleting, or otherwise compromising any potentially relevant evidence regarding the allegations in the complaint, [R. 1], the Amended Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Discovery, [R. 11], and the counterclaims, [R. 36].

6. This temporary restraining order is effective as of the date and time of entry, **March 13, 2026 at 4:50 PM**, and will expire **on the earlier of a ruling by the Court on Plaintiffs' request for preliminary injunction, or fourteen (14) days from its entry** in accordance with Federal Rule of Civil Procedure 65(b)(2) unless extended by subsequent order.

7. At this time, and with neither party requesting a bond, the Court will not require a bond and will instead consider the issue at the time it addresses the preliminary injunction request. *See generally Appalachian Regional Healthcare, Inc. v. Coventry Health and Life Ins. Co.*, 714 F.3d 424, 431 (6th Cir. 2013).

8. Because the Court further believes limited discovery on these issues will aid in the resolution of the request for preliminary injunction, and Defendants voiced no objection to limited discovery, Plaintiffs' request for limited discovery is also **GRANTED**. However, the parameters of that discovery and relevant discovery deadlines will be set forth in a separate order, after the Court's receipt of the Joint Status Report discussed below.

9. On or before **Tuesday, March 17, 2026**, the parties **SHALL** meet and confer and file a Joint Status Report advising of a proposed limited discovery plan, a proposed briefing schedule, and potential agreed upon dates for a preliminary injunction hearing. Upon receipt of the Joint Status Report, the Court will expeditiously enter a discovery plan, enter a briefing schedule, and set a hearing to address the request for a preliminary injunction.

10. On or before **Tuesday, March 17, 2026**, Plaintiffs **SHALL** file a Notice advising the Court of any efforts made to serve those defendants who have not yet appeared in this case in accordance with Federal Rule of Civil Procedure 4.

11. A telephonic status conference is **SCHEDULED** for **Wednesday, March 18, 2026**, **at 1:30 PM**, before the Honorable Claria Horn Boom, U.S. District Court Judge. Counsel shall dial **606-371-5577** and enter access code **272 980 249#**.

This the 13th day of March, 2026.

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY

cc: Counsel of Record